## STATE OF CONNECTICUT *v.* HARRY GONZALEZ
## (SC 18070)

Norcott, Palmer, Zarella, McLachlan, Eveleigh, Harper and Vertefeuille, Js.*

* This appeal was originally argued before a panel of this court consisting of Justices Norcott, Palmer, Zarella, McLachlan, Eveleigh and Vertefeuille. Thereafter, Justice Harper was added to the panel. Justice Harper has read the record and briefs, listened to a recording of the oral argument and participated in the resolution of this case.

Argued January 10—officially released September 6, 2011

*James B. Streeto*, assistant public defender, with whom, on the brief, was *Kent Drager*, former senior assistant public defender, for the appellant (defendant).

*Rita M. Shair*, senior assistant state's attorney, with whom, on the brief, were *David I. Cohen*, state's attorney, and, on the brief, *Maureen Ornousky*, senior assistant state's attorney, for the appellee (state).

EVELEIGH, J. Following a jury trial, the defendant, Harry Gonzalez, was convicted of one count each of felony murder in violation of General Statutes § 53a-54c, robbery in the first degree in violation of General Statutes §§ 53a-133 and 53a-134 (a), and kidnapping in the first degree in violation of General Statutes § 53a-92 (a) (2) (b). On appeal from the judgment of conviction,[1] the defendant claims that: (1) the trial court conducted an inadequate investigation into alleged juror misconduct and improperly denied his motions to dismiss the entire panel of jurors or, alternatively, dismiss four individual jurors; (2) the trial court improperly denied in part his motion to suppress certain statements that he had made to the police; (3) his constitutional right against double jeopardy was violated by his convictions of and separate punishments for felony murder and first degree robbery; and (4) his first degree kidnapping conviction should be overturned because the trial court failed to instruct the jury in accordance with *State* v. *Salamon*, 287 Conn. 509, 949 A.2d 1092 (2008). We conclude that the trial court improperly denied in part the defendant's motion to suppress certain statements that he had made to the police.[2] Accordingly, we reverse the judgment of the trial court and remand the case to that court for a new trial. We also address the merits of the defendant's third claim because it is likely to arise on retrial, and conclude that the defendant's right against double jeopardy was not violated.

The following undisputed facts and procedural history are relevant to our resolution of this appeal. Pursuant to a warrant, on October 28, 2005, the defendant and

---

[1] The defendant appealed directly to this court pursuant to General Statutes § 51-199 (b).

[2] Because we reverse the judgment of conviction on the basis of the defendant's suppression claim, we do not reach the defendant's additional claims on appeal, other than his double jeopardy claim.

Jennifer Kos (Jennifer)[3] were arrested for the murder of the victim, Joanne Trautwein, which had occurred on October 6, 2005. At the time of his arrest, the defendant was not provided warnings in accordance with *Miranda* v. *Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).[4] After arriving at the Stamford police department, the police escorted the defendant to an interview room in order to question him about the murder. There, Paul Guzda, a sergeant of the Stamford police department, and Timothy Dolan, an officer of that police department,[5] were waiting with notepads and pencils for the defendant inside the interview room, which measured approximately twelve feet by eighteen feet and consisted of a central table, several chairs, a clock and a two-way mirror. The defendant initially refused to enter the room, directed an expletive toward Guzda, braced himself against the door, and had to be firmly told to sit down. The defendant was then handcuffed to a chair.

Guzda proceeded to tell the defendant that he would be booked on the pending charges, including felony murder, and that the police were giving him the opportunity to talk to them and to tell his side of the story. At trial, on cross-examination, Guzda testified that he typically used the phrase "opportunity to tell his side of the story" as a way "to open up" suspects in the hope that it would lead to a conversation. Guzda also

---

[3] We note that, because Jennifer Kos shares a surname with another witness in the present case, Barbara Kos, we refer in this opinion to both Jennifer Kos and Barbara Kos by their first names for clarity.

[4] "Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda* v. *Arizona*, supra, 384 U.S. 444. Jennifer, who was separately transported to the Stamford police department, was provided *Miranda* warnings en route.

[5] We refer herein to Guzda and Dolan collectively as the officers, and individually by name where necessary.

testified that, at the time, he was not certain whether the defendant had been provided *Miranda* warnings, although Guzda's admitted goal in interviewing the defendant was to elicit statements concerning the murder. In response, the defendant stated that he wanted an attorney and that he did not want to say anything. Guzda then told the defendant to "sit there and . . . you are going to be booked in a little while." Thereafter, the officers never told the defendant that an attorney would be obtained for him, made no effort to secure counsel for the defendant and did not inform him that any other statements that he made could be used against him. The officers remained seated at the table in silence, looking at the defendant.

Approximately sixty seconds later, the defendant stated that he may have been many things, but that he was not a murderer. In response, Guzda testified that he told the defendant "look, we can't talk to you. I told [you] to be quiet, you asked for an attorney. And basically the conversation was over with because he asked for an attorney." After another approximately sixty seconds had passed, the defendant reiterated that he was not a murderer, and that all he had wanted to do was to find some work and that was the reason that he and Jennifer had gone to Stamford. After this statement, Guzda stopped the defendant and "reminded him that he had asked for an attorney, so [the officers] can't talk to him since he asked for an attorney, [and Guzda explained] that it would have to be the [defendant's] choice to talk to [the officers] without an attorney." At this point the defendant still had not been informed of his *Miranda* rights. Guzda then asked the defendant if he wanted to talk to the officers without an attorney, and the defendant assented. Thereafter, the defendant narrated his activity on the day of the murder. This narration included the defendant's statement that he previously had done some work on the

victim's car, that he and Jennifer had gone to the victim's home that day, that the defendant had asked the victim if she needed any work done on her car, and that when the victim replied in the negative, the defendant and Jennifer had left together. At the conclusion of the narration, Guzda asked the defendant some questions and the interview ended. The entire interview lasted less than one-half hour.

Prior to the start of trial, the defendant filed a motion to suppress the statements that he had made during the police interview. In ruling on the motion to suppress, the issue before the trial court was whether the defendant had been subjected to interrogation when he made the contested statements.[6] In denying in part the defendant's motion to suppress, the trial court analyzed the officers' interview of the defendant as consisting of three distinct episodes and concluded that the officers had not interrogated the defendant during these periods.[7] That court also concluded, however, that Guzda's clarifying questions following the defendant's narration constituted interrogation and, accordingly, suppressed the defendant's statements in response to those questions. Following a jury trial, the defendant was convicted of felony murder, robbery in the first degree and kidnapping in the first degree, and was sentenced to a total effective sentence of eighty years incarceration. This appeal followed. Additional facts will be set forth as necessary.

---

[6] The state had conceded that the defendant was in custody and had not been provided *Miranda* warnings before he made the contested statements.

[7] According to the trial court, the first period began when Guzda explained why the defendant was at the police department, and ended with the defendant stating that he wanted an attorney. The second period began approximately one minute later when the defendant stated that he was not a murderer, and ended when Guzda silenced him. The third period, which contained the defendant's narration, began approximately one minute later when the defendant again stated that he was not a murderer and Guzda explained that if the defendant wanted to speak with the officers, he would have to initiate the conversation.

## I

The defendant claims that the trial court improperly denied in part his motion to suppress the statements that he made to Guzda and Dolan because he made those statements as a result of police interrogation while in custody and without having been informed of his *Miranda* rights. Specifically, the defendant claims that the trial court improperly concluded that he was not subjected to interrogation, where the defendant asserts that Guzda's statement that "[it] was the defendant's opportunity to tell his side of the story" was the "functional equivalent" of interrogation.[8] At oral argument before this court, the state conceded, contrary to the argument in its brief, that Guzda's statement to the defendant was the functional equivalent of interrogation.[9] We agree.

## A

We begin by setting forth the applicable standard of review and governing legal principles. "It is well established that the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self incrimination. *Miranda* v. *Arizona*, [supra, 384 U.S. 444]. Two threshold conditions must be satisfied in order to invoke the warnings constitutionally required by *Miranda*: (1) the defendant must have been in custody; and (2) the defendant must have been subjected to police interrogation. . . . *State* v. *Turner*, 267 Conn. 414, 434, 838 A.2d 947,

[8] See *Rhode Island* v. *Innis*, 446 U.S. 291, 300–301, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980) (interrogation under *Miranda* encompasses both express questioning and its functional equivalent).

[9] In its written argument to this court, the state previously had claimed that Guzda's statement merely was a preliminary comment and permissible under *Rhode Island* v. *Innis*, 446 U.S. 291, 301, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980), as the type of conduct that is normally attendant to arrest.

cert. denied, 543 U.S. 809, 125 S. Ct. 36, 160 L. Ed. 2d 12 (2004). . . .

"A defendant in custody is subject to interrogation not only in the face of express questioning by police but also when subjected to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. . . . [*State* v. *Canales*, 281 Conn. 572, 585, 916 A.2d 767 (2007)], quoting *Rhode Island* v. *Innis*, 446 U.S. 291, 301, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980)." (Citation omitted; internal quotation marks omitted.) *State* v. *Mullins*, 288 Conn. 345, 361–62, 952 A.2d 784 (2008).

"[W]hether a defendant was subjected to interrogation . . . involves a . . . two step inquiry in which the court must determine first, the factual circumstances of the police conduct in question, and second, whether such conduct is normally attendant to arrest and custody or whether the police should know that it is reasonably likely to elicit an incriminating response. . . . Because this framework is analogous to the determination of whether a defendant is in custody, the ultimate determination, therefore, of whether a defendant already in custody has been subjected to interrogation also presents a mixed question of law and fact over which our review is plenary, tempered by our scrupulous examination of the record to ascertain whether the findings are supported by substantial evidence." (Citation omitted.) Id., 364.

"As a general matter, the standard of review for a motion to suppress is well settled. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [W]hen [however] a question of fact is essential to the outcome of a particular legal determination that

implicates a defendant's constitutional rights, and the credibility of witnesses is not the primary issue, our customary deference to the trial court's factual findings is tempered by a scrupulous examination of the record to ascertain that the trial court's factual findings are supported by substantial evidence. . . . [When] the legal conclusions of the court are challenged, [our review is plenary, and] we must determine whether they are legally and logically correct and whether they find support in the facts set [forth] in the memorandum of decision . . . ." (Citations omitted; internal quotation marks omitted.) Id., 362–63.

We begin by examining the factual circumstances of the police conduct surrounding the defendant's contested statements. See id., 364. The determination of whether "words or actions on the part of the police . . . [are ones] that the police should know are reasonably likely to elicit an incriminating response from the suspect . . . focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police." *Rhode Island* v. *Innis*, supra, 446 U.S. 301. As previously set forth, the police escorted the defendant into an archetypal interrogation room— which the defendant physically resisted by barricading himself against the door frame—for the specific purpose of interviewing him regarding the murder. Once there, the defendant was firmly instructed to sit down and was then handcuffed to the chair in which he was sitting. The defendant, faced by the officers with notepads and pencils, was then apprised of the fact that he was being charged with felony murder and was told that the police were giving him the opportunity to tell his side of the story. Although the defendant initially

persisted in resisting being interviewed by stating that he wanted an attorney and that he would not speak to the officers, the officers only told the defendant to sit there and wait to be booked, made no effort to honor the defendant's request for counsel or to explain his rights and remained seated at the table, staring at the defendant in silence. Approximately sixty seconds later, the defendant began making the contested statements.

As the state conceded at oral argument before this court, Guzda's statement to the defendant that it was the defendant's "opportunity to talk to us and to tell his side" of the story did not constitute words or actions on the part of the police that this court has determined are permissible under *Miranda* as normally attendant to arrest and custody. See, e.g., *State* v. *Grant*, 286 Conn. 499, 528–29, 944 A.2d 947 (officer's factual statement to defendant that his blood had been found at crime scene not interrogation), cert. denied, 555 U.S. 916, 129 S. Ct. 271, 172 L. Ed. 2d 200 (2008); *State* v. *Kirby*, 280 Conn. 361, 399–400, 908 A.2d 506 (2006) (asking whether suspect understood his rights not interrogation); *State* v. *Evans*, 203 Conn. 212, 225–27, 523 A.2d 1306 (1987) (routine booking questions unrelated to crime and objectively neutral not interrogation). The phrase "opportunity to talk to us and to tell us [your] side" of the story also is dissimilar to statements or questions directed at suspects that this court has determined were permissible because they were not reasonably likely to elicit an incriminating response from a suspect. See, e.g., *State* v. *Canady*, 297 Conn. 322, 337–38, 998 A.2d 1135 (2010) (question not interrogation when juvenile detention facility officer, unaware of murder investigation involving defendant, asked distraught and scared defendant whether he was " 'okay' "); *State* v. *Medina*, 228 Conn. 281, 291, 636 A.2d 351 (1994) (question not interrogation when officer, unaware that crime had

been committed, asked visibly upset defendant whether he was all right and what had happened).

Unlike the questions in the aforementioned cases, Guzda's statement to the defendant in the present case that it was his opportunity to tell his side of the story was not an objectively neutral question unrelated to the crime. See *State* v. *Canales*, supra, 281 Conn. 589–90. On the contrary, Guzda's statement to the defendant was directly related to the murder investigation for which the defendant had been arrested, charged, and was presently being held in custody. See id., 590 ("relationship of the questions asked to the crime committed is highly relevant" in determining whether police words or conduct was reasonably likely to elicit incriminating response [internal quotation marks omitted]). Guzda's statement was not objectively neutral because it implied that the defendant was involved in the murder and explicitly sought statements from the defendant regarding his involvement in the charged crime. In *State* v. *Hoeplinger*, 206 Conn. 278, 287 n.6, 537 A.2d 1010 (1988), this court similarly concluded that "[t]here [was] no question that the defendant was subject to interrogation" when an officer had requested that the defendant "give him a statement concerning what happened that night" because, pursuant to *Rhode Island* v. *Innis*, supra, 446 U.S. 301, police should know that such words are reasonably likely to elicit incriminating statements. Likewise, in *State* v. *Green*, 207 Conn. 1, 8, 540 A.2d 659 (1988), this court concluded that the defendant therein had been subjected to police interrogation when an officer, who had been informed of the defendant's involvement in a murder by other suspects, told the defendant that "I'm aware that you have given a statement yesterday; however, is there something else you want to tell us about this thing because it doesn't fit with what we know." (Internal quotation marks omitted.)

Guzda's statement to the defendant was similarly, if not more, likely to elicit an incriminating response.

Finally, although "[t]he test as to whether a particular question is likely to elicit an incriminating response is objective . . . the subjective intent of the police officer [may be] relevant [although] not conclusive . . . ." (Internal quotation marks omitted.) *State* v. *Canales,* supra, 281 Conn. 590; see also *State* v. *Green,* supra, 207 Conn. 7 (officer separated defendant from his father in order to elicit " 'admissions against [his] interest' "). At the suppression hearing, Guzda himself testified that he told the defendant that it was his opportunity to tell his side of the story as a way "to open up" the defendant in the hope that it would prompt the defendant to converse about the murder. Guzda also admitted that he had accomplished the goal of prompting the defendant to talk. Given these admissions, Guzda obviously knew that his words were reasonably likely to result in the defendant making possibly incriminating statements about the crime that he had been charged with committing.

We therefore conclude, on the basis of our scrupulous examination of the facts presented, that Guzda's statement to the defendant that it was the defendant's opportunity to tell his side of the story was the functional equivalent of interrogation because the police should have known that the phrase was reasonably likely to invite the defendant to respond by making possibly incriminating statements.[10] Accordingly, the trial court

[10] We note that our conclusion on this issue is consistent with the decisions of courts of several of our sister states holding that telling a suspect that it is his opportunity to tell his side of the story constitutes the functional equivalent of interrogation. See *People* v. *Wood,* 135 P.3d 744, 751–52 (Colo. 2006); *State* v. *Monroe,* 103 Idaho 129, 130, 645 P.2d 363 (1982); *State* v. *Herbert,* 277 Kan. 61, 70, 82 P.3d 470 (2004); *State* v. *Doughty,* 472 N.W.2d 299, 303 (Minn. 1991); *State* v. *Lynch,* 477 N.W.2d 743, 746 (Minn. App. 1991); *State* v. *Williams,* 6 Ohio St. 3d 281, 290, 452 N.E.2d 1323 (1983); *State* v. *Kerby,* 162 Ohio App. 3d 353, 368, 833 N.E.2d 757 (2005); *State* v. *Crawford,* 73 Or. App. 53, 58, 698 P.2d 40 (1985); *State* v. *Barmon,* 67 Or. App. 369,

improperly denied in part the defendant's motion to suppress when it determined that the contested statements were admissible because the defendant had not been subjected to interrogation.

The state, despite conceding that the defendant was in custody, was not provided *Miranda* warnings, and was subjected to interrogation, contends, however, that the interrogation produced no statements.[11] Additionally, the state claims that the officers had no opportunity to provide *Miranda* warnings to the defendant. We disagree with both of the state's assertions.

We begin our analysis with the following guiding principle. When the police interrogate a custodial suspect without first providing that suspect with the warnings required by *Miranda*, there is a presumption that any ensuing statements made by the suspect resulting from the unwarned interrogation were compelled and must be suppressed. *Miranda* v. *Arizona*, supra, 384 U.S. 471–72; see also *Dickerson* v. *United States*, 530 U.S. 428, 435, 120 S. Ct. 2326, 147 L. Ed. 2d 405 (2000) ("[t]hose guidelines [set forth in *Miranda*] established that the admissibility in evidence of any statement given

376–77, 679 P.2d 888, petition for review denied, 297 Or. 227, 683 P.2d 91 (1984); *State* v. *McDade*, 44 Or. App. 269, 273, 605 P.2d 752 (1980); but see *State* v. *Reeves*, 696 So. 2d 226, 230 (La. App. 1997); *People* v. *White*, 10 N.Y.3d 286, 290, 886 N.E.2d 156, 856 N.Y.S.2d 534 (2008); *Commonwealth* v. *Franklin*, 438 Pa. 411, 415–16, 265 A.2d 361 (1970). We note, however, that in the three instances in which our sister states have reached a decision contrary to our holding in the present case, dissenting justices would have concluded that the defendant was subjected to interrogation. See *State* v. *Reeves*, supra, 234 (Thibodeaux, J., dissenting); *People* v. *White*, supra, 294 (Pigott, J., dissenting); *Commonwealth* v. *Franklin*, supra, 422 (Roberts, J., dissenting).

[11] In support of this claim, the state relies on the trial court's division of the officers' interview of the defendant into three distinct episodes. See footnote 7 of this opinion. Under this approach, the state contends that the improper interrogation is confined to the first episode, in which the defendant made no statement, and that the two subsequent episodes, independent of the improper interrogation, therefore contain admissible statements.

during custodial interrogation of a suspect would depend on whether the police provided the suspect with [the] four [*Miranda*] warnings"); *Oregon* v. *Elstad*, 470 U.S. 298, 309, 310, 105 S. Ct. 1285, 84 L. Ed. 2d 222 (1985) ("*Miranda* requires that the unwarned admission must be suppressed . . . ." This is true even though "[t]he failure of police to administer *Miranda* warnings does not mean that the statements received have actually been coerced, but only that courts will presume [that] the privilege against compulsory self-incrimination has not been intelligently exercised.").

We consider first the state's contention that the interrogation produced no statements. This claim has as its basis the view that the officers' interview of the defendant should be divided into independent episodes, thereby segregating the improper custodial interrogation from the resulting effects, namely, the defendant's statements. We reject this claim. We previously have concluded, and the state has conceded, that at the *onset* of the interview the police improperly subjected the defendant to custodial interrogation without the benefit of *Miranda* warnings. Moreover, the state has not challenged the trial court's decision to suppress statements the defendant made at the *end* of the interview, because those statements were the product of interrogation, namely, Guzda's clarifying questions. It is therefore uncontested that the improper custodial interrogation of the defendant, which commenced at the onset of the interview, existed also at the conclusion of the interview. A scrupulous review of the record demonstrates that during the intervening period, when the defendant made the contested statements, the interrogation had not ceased and the defendant's rights had not been honored.

First, the fact that approximately sixty seconds elapsed between Guzda's statement and the defendant's first contested statement, and then again between the

defendant's first and second contested statements, does not undermine our conclusion that the defendant made the contested statements *as a result of and in response to* Guzda's intentional prompting of the defendant at the onset of the interview to tell his side of the story. Contrary to the state's claim, the passage of approximately sixty seconds does not dictate that the defendant's interrogation must be segregated into periods of improper interrogation and no interrogation. Second, although the defendant stated that he wanted an attorney, in response to his invocation he observed the officers seemingly make no effort to honor this request or explain to him that an attorney would be obtained for him; instead, they told him to sit and wait to be booked and they then remained seated at the table, staring in silence at the defendant until he began making the contested statements. Third, although the defendant had stated that he would not speak with the officers, his request to remain silent was not scrupulously honored because no steps were undertaken to conclude the interrogation or belatedly advise the defendant of his *Miranda* rights.[12] Although Guzda testified that the defendant initiated the conversation concerning his activities on the day of the murder, and implicitly waived his right to remain silent, Guzda had told the defendant how to waive a right of which the officers had not yet properly advised him. Moreover, once the defendant commenced narrating his activity on the day of the murder—a statement made in response to Guzda's clarification that the defendant had to initiate the conversation—the officers did not ascertain whether the defendant was waiving his prior request for counsel. The officers also never presented the defendant with a waiver of rights form that had been in their possession

---

[12] "[T]he admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.'" *Michigan* v. *Mosley*, 423 U.S. 96, 104, 96 S. Ct. 321, 46 L. Ed. 2d 313 (1975).

throughout the interview. The present case is thus unlike cases wherein later statements made by a suspect are admissible because "a [subsequent] careful and thorough administration of *Miranda* warnings serve[d] to cure the condition that rendered the [prior] unwarned statement inadmissible. [This warning cures the condition because it] conveys the relevant information and thereafter the suspect's choice whether to exercise his privilege to remain silent should ordinarily be viewed as an 'act of free will.' " *Oregon* v. *Elstad,* supra, 470 U.S. 310. Accordingly, the defendant's statements resulted from his being subjected to improper custodial interrogation at the onset of the interview and, because his rights were not honored during the intervening period, we cannot conclude, under the facts presented, that the defendant's statements were not the product of interrogation.[13]

---

[13] We disagree with the dissent's contention that the majority opinion reaches a conclusion "belied by the facts and the law, and represents an unwarranted extension of the principles of *Miranda* such that its decision will inject confusion into our case law." We also disagree with the dissent's claims that the majority opinion fails to explain our reasoning, fails to cite authority, and fails to provide adequate guidance to the courts or law enforcement.

First, we disagree that the majority opinion belies the facts of the case. In the majority's view, the dissent parses the facts without considering the broader circumstances demonstrating that the defendant's statements resulted from improper custodial interrogation. Specifically, we reiterate the facts that the defendant was in custody and taken to an interrogation room, handcuffed to a chair, and never apprised of his rights; that Guzda, with the intent to prompt the defendant to speak about the murder, then posed a question to the defendant that was the functional equivalent of interrogation; and that the officers, in response to the defendant's attempt to invoke his right to remain silent and have counsel present, simply told the defendant to sit there and wait to be booked, and then stared at the defendant in silence until he made his first statement.

Second, we disagree with the dissent that the majority opinion is inconsistent with our case law or an unwarranted extension of it. The majority opinion's conclusion merely applies the requirement that a suspect's unwarned statements made in response to improper custodial interrogation are inadmissible.

Third, we disagree that the opinion fails to explain our reasoning. To the contrary, the majority opinion's reasoning sets forth that the first and second

statements at issue were made in response to the question posed by Guzda at the beginning of the interrogation. As to the first statement, only sixty seconds had elapsed since Guzda's question, and the officers' admonition to the defendant to remain seated and to wait to be booked did not demonstrate that the interrogation had ended when the officers remained seated with pencils and pads of paper at the ready, staring at the defendant. As to the second statement that the dissent focuses on, this statement occurred only an approximate sixty seconds after defendant's first statement, and although the officers had told the defendant in the interim "to be quiet," this admonishment could not have served to end the interrogation as it would have been meaningless to the defendant because he had not been advised that, pursuant to *Miranda*, anything further that he said could be used against him. The present case is thus unlike *State* v. *Canales*, supra, 281 Conn. 588–92, because the defendant here had not been provided *Miranda* warnings prior to the interrogation commencing and thus would not have known that the invocation of the right to remain silent concluded the interrogation and rendered any of his subsequent statements admissible as a waiver of that right. *Canales* is therefore distinguishable on the basis that: (1) the suspect there was provided *Miranda* warnings at the police station prior to being interviewed; (2) the suspect clearly commenced a discussion with the officer by asking him a question after previously having invoked her rights; and (3) the suspect's later statements were not the product of interrogation and were admissible because she validly waived her rights because she had been properly apprised of them. See *State* v. *Shifflett*, 199 Conn. 718, 731–32, 508 A.2d 748 (1986) ("Absent an express waiver, the prosecution bears a heavy burden to demonstrate that the defendant voluntarily, knowingly and intelligently waived his right to remain silent and his right to counsel during custodial interrogation. . . . As in every case, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. . . . Thus, while an express written or oral statement of waiver . . . is not inevitably either necessary or sufficient to establish waiver of *Miranda* rights . . . the state must demonstrate: (1) that the defendant understood his rights, and (2) that the defendant's course of conduct indicated that he did, in fact, waive those rights." [Citations omitted; emphasis omitted; internal quotation marks omitted.]).

Fourth, we disagree that this opinion lacks sufficient citation to authority. In our view, the majority opinion adequately surveys our case law on the issue of the admissibility of statements obtained as a result of improper custodial interrogation and a resort to federal decisions applying the same principles is unnecessary. Fifth, we disagree that the opinion fails to "provide any rule or principle to guide courts" as to when an interrogation has ended. We decline to create a bright line rule or set of conditions that dictate when an interrogation commences or concludes and instead affirm that "whether a [custodial] defendant was subjected to interrogation . . . involves a . . . two step inquiry in which the court must determine first, the factual circumstances of the police conduct in question, and second, whether such conduct is normally attendant to arrest and custody or whether the police should know that it is reasonably likely to elicit an incriminating response." *State*

We also reject the state's second claim that the officers had no opportunity to provide *Miranda* warnings to the defendant. Initially, we note that the defendant could have been provided *Miranda* warnings numerous times, including promptly upon arrest, prior to being escorted to the interview room, immediately after being handcuffed to the chair, or following Guzda's statement that the defendant was being charged with felony murder. Guzda himself admitted at the suppression hearing that he had a *Miranda* rights waiver form with him in the interview room, but that he had put it away after the defendant stated that he wanted an attorney and would not speak with the officers. This court has previously determined, however, that advising a custodial suspect of his rights and then ascertaining whether he understands those rights does not constitute interrogation under *Miranda*. *State* v. *Kirby*, supra, 280 Conn. 399–400. Therefore, even after the defendant attempted to invoke his rights, the officers had an opportunity, lasting one minute or more, to commence advising the defendant of his *Miranda* rights.

The officers also failed to utilize several other opportunities to provide the defendant with proper *Miranda* warnings. Following the defendant's first contested statement that he was not a murderer, the officers had an approximate one minute opportunity to read the defendant his *Miranda* rights. Following the defendant's second contested statement reiterating that he was not a murderer, the officers had yet another momentary opportunity to provide the defendant his *Miranda* rights. Lastly, prior to the defendant narrating

v. *Mullins*, supra, 288 Conn. 364. In performing this inquiry, we believe that the current standard of review as to whether a defendant already in custody has been subject to improper interrogation, which is a mixed question of law and fact, is the proper standard, "tempered by our scrupulous examination of the record to ascertain whether the findings are supported by substantial evidence." Id.

his activity on the day of the murder, the officers could have read the defendant his *Miranda* warnings and then secured a valid waiver. Guzda, however, used this time to tell the defendant that the officers could not speak with him unless he initiated the conversation. Accordingly, the record reveals numerous instances in which the officers had ample opportunity to provide the defendant with *Miranda* warnings, but failed to do so.

## B

The state further contends that, even if the trial court improperly admitted the defendant's contested statement narrating his activity on the day of the murder, any error was harmless beyond a reasonable doubt because other evidence overwhelmingly established the defendant's guilt.[14] The defendant disagrees, claiming that there was not overwhelming evidence of his guilt and that the state relied on the defendant's narration in order to establish his guilt. We agree with the defendant.

"If statements taken in violation of *Miranda* are admitted into evidence during a trial, their admission must be reviewed in light of the harmless error doctrine. . . . The harmless error doctrine is rooted in the fundamental purpose of the criminal justice system, namely, to convict the guilty and acquit the innocent. . . . Therefore, whether an error is harmful depends on its impact on the trier of fact and the result of the case. . . . This court has held in a number of cases that when there is independent overwhelming evidence of guilt,

---

[14] Neither party specifically addresses whether the improper admission of the defendant's first two contested statements was harmful. In accordance with our conclusions that the two statements resulted from an improper custodial interrogation and that the admission of the defendant's narration was not harmless beyond a reasonable doubt, we also conclude that the admission of the defendant's first two statements was harmful, because they also give rise to the inference that the defendant was present at the victim's home, even if he denied committing the murder.

a constitutional error would be rendered harmless beyond a reasonable doubt. . . . When an [evidentiary] impropriety is of constitutional proportions, the state bears the burden of proving that the error was harmless beyond a reasonable doubt. . . . [W]e must examine the impact of the evidence on the trier of fact and the result of the trial. . . . If the evidence may have had a tendency to influence the judgment of the jury, it cannot be considered harmless. . . . That determination must be made in light of the entire record [including the strength of the state's case without the evidence admitted in error]." (Citations omitted; internal quotation marks omitted.) *State* v. *Mitchell*, 296 Conn. 449, 459–60, 996 A.2d 251 (2010).

The jury reasonably could have found the following additional facts relevant to the determination of whether the admission of the defendant's statements was harmless error. At trial, Jennifer, testifying for the state, stated that she was the defendant's companion on the day of the murder. She testified about the defendant's activity on that day, specifically placing him at the victim's home both during the afternoon and evening of the murder, and directly inculpated the defendant in the charged crimes. On cross-examination, Jennifer admitted that, at the time of the murder, she had been a drug addict and an alcoholic, that she had prior convictions of larceny and assault, that she had admitted to being a burglar and felony murderer, that she previously had lied to the police on multiple occasions during their investigation of the murder, and that she had agreed to testify against the defendant because it was her only option to save herself from eighty years of incarceration.[15]

Also testifying against the defendant was the victim's housemate, Barbara Kos (Barbara).[16] Although Barbara

---

[15] Pursuant to a plea agreement, Jennifer received ten years incarceration.

[16] The subsequent police investigation determined that there was no familial relationship between Jennifer and Barbara.

testified that she was present when the crimes were committed and that she had observed a male perpetrator, she admitted during cross-examination that she had been unable to identify the defendant as the perpetrator from a photographic array containing his photograph, and that she had provided a description of the perpetrator to the police that did not match that of the defendant. Specifically, Barbara had described the perpetrator as a male with a "noticeable beer belly," and as clean-shaven. The victim's neighbor, Carol Luders, testified that, on the afternoon of the crime, she had encountered a male and Jennifer inquiring about the victim. On cross-examination Luders admitted, however, that she had failed to identify the defendant as the male that she had seen that afternoon when presented with a photographic array containing the defendant's photograph, and that she, too, had described the male as clean-shaven.

The state asserts that the following evidence adduced at trial is independent overwhelming evidence that the defendant committed the charged crimes: (1) the testimony of Jennifer, the defendant's companion, regarding the defendant's activity on the day of the murder that inculpated the defendant in the crimes; (2) the testimony of the victim's housemate, Barbara, who was present when the crimes were committed and observed the defendant; and (3) the testimony of Luders, the neighbor, who encountered the defendant and Jennifer inquiring about the victim on the afternoon of the murder.

The defendant disagrees, claiming that the state cannot prove beyond a reasonable doubt that the trial court's admission of his narration was harmless because the aforementioned evidence was not overwhelming evidence of his guilt. The defendant first asserts that the only testimony directly linking him to the murder was that of Jennifer. The defendant claims,

however, that Jennifer's credibility was greatly impeached by her admissions on both direct and cross-examination. The defendant further asserts that the testimony of Barbara and Luders was not independent overwhelming evidence of his guilt. Barbara, the defendant contends, despite being an eyewitness to the crime and having observed a male perpetrator, was unable to identify the defendant as the perpetrator in a photographic array that contained the defendant's photograph, and she provided to the police a description of the perpetrator that did not match that of the defendant, namely, that the perpetrator had a "noticeable beer belly" and was clean-shaven. The defendant claims, however, that he did not have a beer belly and that he was not clean-shaven. The defendant instead claims that he had a mustache, a fact that the defendant contends is confirmed by photographs from several days prior to the murder and on the day of his arrest. Similarly, the defendant asserts that Luders also failed to identify the defendant as the male perpetrator when presented with a photographic array containing his photograph, and she also described the male as clean-shaven. Finally, in addition to the ambiguous testimonial evidence, the defendant points out that, although the knife used to commit the murder had male DNA on it, testimony demonstrated that the DNA did not match that of the defendant.

In light of this less than overwhelming evidence, we must next determine whether the improper admission of the defendant's narration may have had a tendency to influence the judgment of the jury. First, although the state contends that the defendant's narration was exculpatory, we disagree. On its face, the defendant's narration, by placing himself at the victim's home that afternoon, served to implicate him in the charged crimes. The statement was therefore not innocuous or unrelated to the charged conduct. See *State* v. *Mitchell*,

supra, 296 Conn. 461 (concluding that statements were not harmful because defendant "did not confess to committing any crime or to being at or near the scene of the crime"). Second, even if the defendant's statements had been facially neutral, the state portrayed the defendant's narration as inculpatory. For example, the prosecutor delivered the following statement to the jury during closing argument: "But the reason—the reason that really nails this down [that the defendant was the male that afternoon] is the defendant admits, to [the officers], that he's the guy. He admits that he's the one that went to the mailbox and talked to [Luders] earlier . . . that day. . . .

"So . . . Luders' description is consistent with Barbara['s] and . . . [Jennifer] corroborates what . . . Luders says happened, *but the defendant himself admits to the police that he's that guy.*" (Emphasis added.) The state, therefore, explicitly focused the jury's attention on the defendant's narration of his activity on the day of the murder and relied on that narration in order to place the defendant at the victim's home. In so doing, the state also sought to use the defendant's statement to bolster the credibility of its witnesses by corroborating their testimony placing the defendant at the victim's home.

Finally, the state's evidence against the defendant was not so overwhelming that we are convinced beyond a reasonable doubt that the admission of his improperly obtained narration was harmless. As previously set forth herein, the state emphasized the defendant's narration and used it to corroborate the testimony of the state's other witnesses, two of whom admitted on cross-examination that they had been unable to identify Jennifer's male companion from photographic arrays, which subsequent police testimony confirmed had contained the defendant's photograph. The inability of key witnesses—including the surviving victim, Barbara—to

identify the defendant in the photographic array, their descriptions of the male suspect's features, which differed from the defendant's physical description of himself during the relevant time period, and the lack of the defendant's DNA on the knife, all weigh against the determination that there existed overwhelming evidence of the defendant's guilt in this case. Additionally, the defendant's successful effort on numerous occasions to impeach Jennifer's credibility may have affected the weight the jury accorded her testimony, testimony that was central to the state's case.

The strength of the evidence of the defendant's guilt is therefore weaker than in instances in which we have held that the state's improper use of evidence was harmless beyond a reasonable doubt. For instance, in *State* v. *Brunetti*, 279 Conn. 39, 78, 901 A.2d 1 (2006), cert. denied, 549 U.S. 1212, 127 S. Ct. 1328, 167 L. Ed. 2d 85 (2007), we concluded there was overwhelming evidence of the defendant's guilt when "the defendant was seen in close proximity to the crime scene at the time of the victim's murder, the victim's blood was found on the defendant's clothing, the defendant provided a detailed confession explaining how and why he had murdered the victim, a part of the defendant's necklace was found in the victim's hair and the defendant sought to cover up the crime by lying to his father about the source of the blood on his clothing." Similarly, in *State* v. *Mitchell*, supra, 296 Conn. 462, we concluded that the state's evidence against the defendant was sufficiently strong when "the defendant was found in the automobile that the victim and [another witness] had seen leave the scene of the assault. The car matched the color, description and, most significantly, the license plate number given to the police. In addition, the car was stopped by the police traveling in the direction that it was last seen by the [other witness], specifically driving on Interstate 95, away from the scene of the assault. Furthermore, the

victim provided a prompt, unhesitating identification of the defendant within only one hour of the attack. Her identification of the defendant was strong evidence against him because the victim testified that she had had close contact with her assailant." See also *State* v. *Bonner*, 290 Conn. 468, 501, 964 A.2d 73 (2009) (overwhelming evidence of guilt when two eyewitnesses saw defendant point gun, another witness saw defendant flee crime scene, defendant later telephoned witness that saw him flee and essentially confessed, and defendant confessed to crime in jail).

In light of the other evidence proffered by the state, the improperly admitted narration, which the state explicitly urged the jury to rely upon, may have had a tendency to influence the judgment of the jury. Accordingly, under the facts presented, we conclude that admitting the improperly obtained narration was not harmless beyond a reasonable doubt.

## II

Although our conclusion in part I of this opinion requires that the case be remanded to the trial court for a new trial, we address the defendant's claim of double jeopardy because the issue is likely to arise again on remand.[17] See *State* v. *Gupta*, 297 Conn. 211, 234, 998 A.2d 1085 (2010). We therefore address the defendant's claim that his separate convictions of and punishments for felony murder, pursuant to § 53a-54c,[18]

---

[17] The defendant failed to raise this claim at trial. He therefore seeks review of his unpreserved claim pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). Because the record is adequate for our review in that it is undisputed that each of the crimes with which the defendant was charged arose out of the same transaction and the defendant's claim implicates his constitutional right against double jeopardy, we consider the merits of his claim.

[18] General Statutes § 53a-54c provides in relevant part: "A person is guilty of murder when, acting either alone or with one or more persons, he commits or attempts to commit robbery . . . in the first degree . . . and, in the course of and in furtherance of such crime . . . he, or another participant, if any, causes the death of a person other than one of the participants . . . ."

and robbery in the first degree, pursuant to § 53a-134 (a) (1),[19] violate his right against double jeopardy, where it is alleged that both crimes involved the same aggravating fact, namely, the fatal injury to the victim. We reject this claim and conclude that the defendant may properly be convicted of and punished for both felony murder and robbery in the first degree.

The following additional facts and procedural history are relevant to our resolution of this issue. Malka Shah, the state associate medical examiner, testified at trial that she conducted an autopsy on the victim's body and determined that the victim suffered from an incise wound to the neck, which could have been caused by a knife, that the object that caused the wound had severed the victim's jugular vein, and that she died as a result of a significant loss of blood and an air embolism of the lung. During the robbery, the perpetrator stole two rolls of gold dollar coins as well as some medication from the victim's home. By way of substitute information, the defendant was charged with the crimes of felony murder and robbery in the first degree.[20] Specifically, in the first count, the substitute information charged the defendant with felony murder in that "on or about the 6th day of October, 2005, the [defendant] committed the crime of [r]obbery, and in the course and in the furtherance of such crime he caused the death of [the victim], in violation of [§ 53a-54c]." The second count of the substitute information charged the defendant with robbery in the first degree in that "on or about the 6th day of October, 2005, the [defendant] stole certain property from [the victim], and in the

[19] General Statutes § 53a-134 provides in relevant part: "(a) A person is guilty of robbery in the first degree when, in the course of the commission of the crime of robbery as defined in section 53a-133 or of immediate flight therefrom, he or another participant in the crime: (1) Causes serious physical injury to any person who is not a participant in the crime . . . ."

[20] The defendant was also charged with kidnapping in the first degree, which is not relevant to our determination of this issue.

course of the commission of the crime he caused serious physical injury to [the victim], in violation of [§§ 53a-134 (a) (1) and 53a-133]." As previously set forth, after a jury trial, the defendant was convicted of the two disputed charges, along with the crime of kidnapping in the first degree, and sentenced to a total effective sentence of eighty years incarceration.

On appeal, the defendant claims that his separate convictions and punishments run afoul of the prohibition against double jeopardy because the same aggravating factor, namely, the fatal injury to the victim, forms the basis of both the charge of felony murder and the charge of robbery in the first degree under subsection (a) (1) of § 53a-134. Specifically, the defendant contends that an accused may only be convicted of and punished for both felony murder and robbery in the first degree when the accused is charged with an aggravating factor listed in § 53a-134 (a) other than the aggravating factor set forth in subsection (a) (1) of § 53a-134, for causing "serious physical injury . . . ."[21] The state disagrees, claiming that the charge of robbery in the first degree, as actually charged against the defendant, does not constitute the same offense as felony murder and therefore does not violate the prohibition on double jeopardy. In the alternative, the state claims that this court's decision in *State* v. *Greco*, 216 Conn.

---

[21] In addition to the aggravating factor set forth in subsection (a) (1) of § 53a-134 of causing serious physical injury to a person who is not a participant in the crime, a person may be guilty of robbery in the first degree if the person: (1) was armed with a deadly weapon; General Statutes § 53a-134 (a) (2); (2) used or threatened the use of a dangerous instrument; General Statutes § 53a-134 (a) (3); or (3) displayed or threatened the use of what the person represented by his words or conduct to be a firearm. General Statutes § 53a-134 (a) (4). Under the defendant's reasoning, an accused may properly be convicted of and punished for felony murder and robbery in the first degree without violating the prohibition on double jeopardy because the aggravating factors under subsections (a) (2), (a) (3) and (a) (4) of § 53a-134, are unlike the aggravating factor in § 53a-134 (a) (1), which forms the basis of a felony murder charge, namely, a fatal injury.

282, 579 A.2d 84 (1990), wherein we concluded that convictions of felony murder and robbery in the first degree did not violate the defendant's right against double jeopardy, is dispositive of the defendant's claim. We agree with the state on the basis of its second claim.

We begin by setting forth the applicable standard of review and governing legal principles. A "defendant's double jeopardy claim presents a question of law, over which our review is plenary." *State* v. *Burnell*, 290 Conn. 634, 642, 966 A.2d 168 (2009). "The double jeopardy clause of the fifth amendment to the United States constitution provides: [N]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb. The double jeopardy clause [applies] to the states through the due process clause of the fourteenth amendment. . . . This constitutional guarantee prohibits not only multiple trials for the same offense, but also multiple punishments for the same offense in a single trial. . . . Although the Connecticut constitution does not include a double jeopardy provision, the due process guarantee of article first, § 9, of our state constitution encompasses protection against double jeopardy. . . .

"Double jeopardy analysis in the context of a single trial is a two-step process. First, the charges must arise out of the same act or transaction. Second, it must be determined whether the charged crimes are the same offense. Multiple punishments are forbidden only if both conditions are met. . . .

"Traditionally we have applied the *Blockburger* test to determine whether two statutes criminalize the same offense, thus placing a defendant prosecuted under both statutes in double jeopardy: [W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether

each provision requires proof of a fact which the other does not. *Blockburger* v. *United States*, 284 U.S. 299, 304, 52 S. Ct. 180, 76 L. Ed. 306 (1932). This test is a technical one and examines only the statutes, charging instruments, and bill of particulars as opposed to the evidence presented at trial." (Citations omitted; internal quotation marks omitted.) *State* v. *Nixon*, 231 Conn. 545, 549–51, 651 A.2d 1264 (1995). Significantly, "[t]he *Blockburger* rule is not controlling when the legislative intent [permitting a defendant to be prosecuted under both statutes] is clear from the face of the statute or the legislative history." (Internal quotation marks omitted.) Id., 555, quoting *Garrett* v. *United States*, 471 U.S. 773, 779, 105 S. Ct. 2407, 85 L. Ed. 2d 764 (1985). This is because "[t]he role of the constitutional guarantee [against double jeopardy] is limited to assuring that the court does not exceed its legislative authorization by imposing multiple punishments for the same offense. . . . The issue, though essentially constitutional, becomes one of statutory construction." (Citation omitted; internal quotation marks omitted.) *State* v. *Greco*, supra, 216 Conn. 290.

In the present case, it is undisputed that each of the crimes with which the defendant was charged arose out of the same transaction. "Thus, the question is whether robbery in the first degree . . . and felony murder based on the predicate [offense of robbery] are the same offense for the purposes of double jeopardy analysis." Id., 291. In *Greco*, the defendant was charged pursuant to a three count substitute information with felony murder, the predicate offenses being robbery of the victim and burglary of the victim's home; id., 284; robbery in the first degree under subsection (a) (2) of § 53a-143 for being armed with a deadly weapon, and burglary in the first degree. Id., 283–84. On appeal, the defendant in that case claimed that the prohibition on double jeopardy prevented the state from punishing him for

felony murder, robbery in the first degree and burglary in the first degree. Id., 287–88. This court disagreed, concluding that "the double jeopardy clause would not bar the [trial] court from imposing consecutive sentences upon the defendant for the felony murder conviction and for the first degree robbery and first degree burglary convictions . . . ." Id., 288.

In reaching our conclusion in *Greco*, we first analyzed the charged offenses under the *Blockburger* test and "conclude[d] that first degree robbery and first degree burglary constitute the same offense as felony murder under that test, where the felony murder count alleges 'robbery and burglary' as the predicate offenses." Id., 291. This conclusion rested on our determination that "there are no elements of first degree robbery and first degree burglary which are not also elements of felony murder when the felony murder count alleges 'robbery and burglary' as the predicate offenses . . . ."[22] Id., 292. Although robbery in the first degree and burglary in the first degree constituted the same offense as felony murder when the predicate offenses for felony murder were burglary and robbery, "[t]he application of the *Blockburger* test, however, does not end our analysis of the double jeopardy issue. . . . Where . . . a legislature specifically authorizes cumulative punishment under two statutes, regardless of whether those two statutes proscribe the same conduct under *Blockburger*, a court's task of statutory construction is at an end and the prosecutor may seek and the trial court or jury may impose cumulative punishment under such statutes in a single trial." (Citations omitted; internal quotation marks omitted.) Id., 293.

[22] We determined that this conclusion was dictated by our decision in *State* v. *Morin*, 180 Conn. 599, 601–605, 430 A.2d 1297 (1980), wherein we concluded that robbery in the first degree and burglary in the first degree were the lesser included offenses of felony murder.

This court therefore looked to the language, structure and legislative history of § 53a-54c to determine whether the legislature had intended multiple punishments for felony murder and the predicate offenses of robbery and burglary. Id., 293–98. On the basis of this examination, we ultimately concluded in *Greco* "that the legislature clearly intended multiple punishments for felony murder and the underlying predicate offenses of robbery and burglary." Id., 297. Accordingly, the defendant in that case could properly be convicted of and punished for felony murder with predicate offenses of robbery and burglary, as well as robbery in the first degree and burglary in the first degree. Id., 288–89.

We conclude that this court's decision in *Greco* is dispositive of the defendant's claim of double jeopardy in the present case. Similar to the defendant in *Greco*, the defendant in the present case was charged, convicted and punished for the crimes of felony murder, with the underlying predicate crime being robbery, and robbery in the first degree. Although the defendant in *Greco* was charged with first degree robbery under the aggravating factor of being armed with a deadly weapon, as set forth in subsection (a) (2) of § 53a-134; id., 283; and the defendant in the present case was charged pursuant to § 53a-134 (a) (1) for causing serious physical injury to the victim, our analysis of the double jeopardy issue in *Greco* did not depend on the exact aggravating factor levied against the defendant. See id. Indeed, in that case we agreed with the defendant that, under the *Blockburger* test, the crimes of robbery and burglary in the first degree were the same offense as felony murder when the predicate offenses for felony murder were robbery and burglary. Id., 292. Similarly, the crimes with which the defendant in the present case was charged, namely, robbery in the first degree and felony murder with the predicate offense of robbery, constitute the same offense for the same reasoning. See

id.; see also *State* v. *Morin*, 180 Conn. 599, 601–605, 430 A.2d 1297 (1980). Although this court determined in *Greco* that the charged crimes constituted the same offense under the *Blockburger* test, the prohibition against double jeopardy was not violated in *Greco* because the legislature clearly intended to permit the state to charge, the jury to convict, and the trial court to sentence, that defendant for the crimes of felony murder with the predicate offenses of robbery and burglary, and the crimes of robbery and burglary in the first degree. *State* v. *Greco*, supra, 216 Conn. 293–98. We see no reason in the present case to deviate from our well settled jurisprudence. Accordingly, the defendant may properly be convicted of and punished for the crimes of felony murder with the predicate offense of robbery, and the crime of robbery in the first degree under § 53a-134 (a) (1).

The judgment is reversed and the case is remanded for a new trial.

In this opinion PALMER, HARPER and VERTE-FEUILLE, Js., concurred.

ZARELLA, J., with whom NORCOTT and McLACH-LAN, Js., join, concurring in part and dissenting in part. I agree with the majority's conclusion that the conviction of the defendant, Harry Gonzalez, must be reversed on the basis of a violation of the requirements of *Miranda* v. *Arizona*, 384 U.S. 436, 444–45, 479, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). I further agree with the majority that the defendant's constitutional right against double jeopardy was not violated. I dissent from the majority opinion, however, insofar as the majority concludes that the police failed to honor the defendant's invocation of his rights to remain silent and to counsel, that the initial interrogation of the defendant did not cease when he invoked his rights, and that all of the

defendant's statements to the police were a product of that interrogation. In my view, when a suspect invokes his rights, and the police acknowledge the invocation, stop questioning him, and instruct him to "be quiet" when he attempts to speak, the facts are sufficient to demonstrate that the interrogation has ceased. To the extent that the majority reaches a contrary conclusion, such a conclusion is belied by the facts and the law, and represents an unwarranted extension of the principles of *Miranda* such that its decision will inject confusion into our case law. The policy behind *Miranda* is to shield a suspect from unwanted questioning rather than to suppress voluntary statements that are not a direct result of improper questioning by the police. For these reasons, I dissent in part from the majority opinion.

Because the facts of the present case are important to the analysis of the defendant's claim under *Miranda*, I review them briefly. According to the trial court's decision and the testimony at the suppression hearing, the defendant was brought to an interview room at the Stamford police department, and, when he got to the door of the room, he directed an expletive at Sergeant Paul Guzda, one of several police officers in the vicinity, and initially refused to enter the room. Guzda and Officer Timothy Dolan had been waiting in the room for the defendant. Once the defendant was seated in the room, he was handcuffed to a chair. Guzda then informed the defendant that he was going to be booked on charges including felony murder and that Guzda wanted to give him an opportunity to tell his side of the story. Although the defendant had not been advised of his *Miranda* rights, the defendant responded to Guzda by stating that he did not want to say anything and that he wanted an attorney. In response, Guzda told the defendant to sit there and that he would be booked shortly. Guzda and Dolan ended their conversa-

tion with the defendant at that point. Neither Guzda nor Dolan asked the defendant any further questions, and the two officers and the defendant sat in the interview room in silence while waiting to be notified that the booking area was available. After approximately one minute, the defendant broke the silence by making a statement (first statement), explaining that he may be many things but that he was not a murderer. In response, Guzda told the defendant to "be quiet," that the officers could not speak to him and that there would be no conversation. After another minute of silence, the defendant made a second statement (second statement), reiterating that he was not a murderer and explaining that he and his accomplice, Jennifer Kos, had gone to Stamford only to look for work. Guzda again stopped the defendant from speaking, reminded him that he had asked for an attorney and told him that the officers could not speak to him. Guzda further informed the defendant that they would like to talk to him but that the only way they could was if he chose to waive his rights to remain silent and to consult with an attorney. Guzda then asked the defendant if he wanted to waive those rights. The defendant answered that he did want to waive his rights, and Guzda asked if the defendant would mind if Guzda took notes while the defendant spoke. The defendant again agreed and began narrating his activities on the day of the murder (narrative statement).

I begin my analysis by noting the portions of the majority opinion with which I agree. First, in light of the state's concession at oral argument that Guzda's initial statement amounted to interrogation, I do not contest the majority's conclusion that Guzda's initial statement was "interrogation" within the meaning of that term as defined in *Rhode Island* v. *Innis*, 446 U.S. 291, 300–301, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980).[1]

[1] I note that not every situation in which an officer makes a similar prefatory statement necessarily must be construed as interrogation. Such a deter-

Second, I agree that, because that statement constituted interrogation, Guzda was required to read the defendant *Miranda* warnings before making the statement to the defendant.

I disagree, however, with the majority's conclusion that the interrogation did not cease when the defendant invoked his rights to remain silent and to counsel, and its conclusion that the officers did not honor the suspect's invocation.[2] In my view, the facts of the present case demonstrate that the initial interrogation, consisting only of Guzda's statement that the officers wanted to give the defendant an opportunity to tell his side of the story, ended when the defendant invoked his rights and Guzda stopped questioning him. For this reason, I disagree with the majority's decision to exclude all of the challenged statements on the ground that they all were a product of an improper and ongoing interrogation. Instead, I would conclude that the initial interrogation ended when the defendant invoked his

mination depends on the circumstances surrounding the inquiry. See *Rhode Island* v. *Innis*, supra, 446 U.S. 300–301. For example, if an officer says to the suspect: "In a moment, we are going to give you an opportunity to tell us your side of the story, but, first, we want to talk to you about your rights," then a court might be less inclined to interpret the statement as being reasonably likely to elicit an incriminating response. Indeed, the foregoing example is not a question and calls for no response from the suspect. If, however, the officer were to say, instead: "Tell us your side of the story," and then stared at the suspect as if awaiting an answer, such an inquiry would certainly rise to the level of interrogation.

[2] I further disagree with the manner in which the majority characterized the claims of the state regarding the statements at issue. In its opinion, the majority describes the state's claims as being that the improper interrogation in the present case "produced no statements" and that the defendant's statements were made "independent[ly] of the improper interrogation." Footnote 11 of the majority opinion. The state is not claiming that the interrogation produced no statements. Indeed, the interrogation produced one statement: that the defendant did not want to speak to the officers and that he wanted an attorney. The state's argument is, more precisely, that the improper interrogation ended and that the contested statements were not a product of any interrogation by the police and, therefore, are admissible.

rights and that the defendant's first and second statements to the police after he invoked his rights were voluntary and not the product of interrogation. Because I would conclude that the police improperly sought to have the defendant waive his rights after the defendant's first and second statements but before the defendant made his narrative statement, however, I agree with the majority that the trial court should have suppressed the narrative statement.

## I

## WHETHER THE INITIAL, IMPROPER INTERROGATION CEASED

*Miranda* and subsequent cases make it clear that the police must immediately stop interrogating a suspect if he invokes his right to remain silent. *Miranda* v. *Arizona*, supra, 384 U.S. 473–74 ("Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease."); see also *Michigan* v. *Mosley*, 423 U.S. 96, 104, 96 S. Ct. 321, 46 L. Ed. 2d 313 (1975) (when suspect invokes right to remain silent, statements in response to further interrogation are admissible only if suspect's request to remain silent was "scrupulously honored" [internal quotation marks omitted]). Furthermore, if a suspect invokes his right to an attorney, the police may not engage in any further interrogation without an attorney present unless the suspect himself initiates the encounter and validly waives his constitutional rights. *Edwards* v. *Arizona*, 451 U.S. 477, 485, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981) ("it is inconsistent with *Miranda* and its progeny for the authorities, at their instance, to reinterrogate an accused in custody if he has clearly asserted his right to counsel"); see also *Smith* v. *Illinois*, 469 U.S. 91, 98, 105 S. Ct. 490, 83 L. Ed. 2d 488 (1984) ("*Edwards* set

forth a 'bright-line rule' that *all* questioning must cease after an accused requests counsel" [emphasis in original]). In the present case, there is no question that the defendant invoked his rights to remain silent and to counsel immediately after Guzda's improper statement. The question, therefore, is whether the interrogation terminated when the suspect invoked his rights to remain silent and to an attorney. I would conclude that it did.

Case law establishes that the cessation of questioning or its functional equivalent is all that is necessary to demonstrate that any interrogation has stopped once a suspect has invoked his rights. See, e.g., *State* v. *Canales*, 281 Conn. 572, 587–89, 916 A.2d 767 (2007) (concluding that interrogation ceased when suspect invoked her rights to remain silent and to counsel and police did not ask further questions about alleged murder); see also *Simpson* v. *Jackson*, 615 F.3d 421, 430–31 (6th Cir. 2010) (upon invocation of rights, police officers need only stop questioning suspect); *United States* v. *Muhammad*, 196 Fed. Appx. 882, 886 (11th Cir. 2006) (police "scrupulously honored" suspect's rights simply by ceasing questioning about crime), cert. denied, 549 U.S. 1235, 127 S. Ct. 1315, 167 L. Ed. 2d 126 (2007). The police need not exit an interrogation room after the suspect invokes his rights in order for an interrogation to cease. See, e.g., *Simpson* v. *Jackson*, supra, 431 ("[I]t is permissible for the officers still to be in the same room with the [suspect] for at least some period of time after he invokes his right to remain silent. The officers need not immediately leave the room; they simply may not continue questioning or badgering the suspect."); see also *United States* v. *Muhammad*, supra, 885–86 (presence of police in interview room after suspect invoked his right to remain silent did not render statements subsequently volunteered by suspect inadmissible). Nor must they explicitly inform the suspect that

the interrogation is over. See, e.g., *State* v. *Canales*, supra, 589 (rejecting defendant's argument that police officer was required to "indicate explicitly that the interview was over"). Finally, there is no requirement that the police actually obtain or take steps to obtain a lawyer when the suspect has requested one, as long as the police do not interrogate the suspect further. See *Edwards* v. *Arizona*, supra, 451 U.S. 484–85 (suspect may not be interrogated further after invoking right to counsel); see also *Davis* v. *United States*, 512 U.S. 452, 458, 114 S. Ct. 2350, 129 L. Ed. 2d 362 (1994) (*Edwards* rule only prohibits further interrogation after suspect has requested counsel); *Miranda* v. *Arizona*, supra, 384 U.S. 474 (police need not "have a 'station house lawyer' present at all times to advise [suspects]" but need only cease questioning after suspect invokes right to counsel).

Applying the foregoing principles to the present case, I would conclude that the initial interrogation had ceased when the defendant invoked his rights to remain silent and to counsel and that the officers were honoring the defendant's invocation of his rights at the time the defendant made his first and second statements. The facts demonstrate that, when the defendant invoked his rights to remain silent and to consult with an attorney, Guzda (1) acknowledged the invocation, (2) responded by telling the defendant what was expected of him at that point and what would happen next, (3) ceased any questioning, (4) went so far as to attempt to silence the defendant when he tried to speak, and (5) specifically told the defendant that any conversation had ended. Although Guzda initially stated to the defendant that he wanted to give the defendant an opportunity to tell his side of the story, and the defendant had not been read his *Miranda* warnings, the defendant immediately responded by stating that he did not want to say anything to the police and that he wanted to speak with

an attorney. In response to this statement, Guzda told the defendant to "just . . . sit there" and that he would be "booked in a little while." The police therefore not only cut off any questioning about the alleged murder when the defendant invoked his rights, but they explained to him the reason for remaining in the room. After Guzda's statement that the defendant would be booked shortly, the officers did not ask the defendant any further questions, and it was the defendant, not the officers, who spoke after he previously had stated that he wished to remain silent. Furthermore, when the defendant attempted to speak to the officers in making his first statement, Guzda immediately instructed the defendant to "be quiet," that they "[could not] talk" to him, and that "the conversation was over . . . ." It is hard to imagine a more direct way to inform the defendant that any interview had ceased and that he was not expected to say anything to the officers. Certainly, an instruction to "be quiet" cannot seriously be interpreted to be reasonably likely to elicit an incriminating response and therefore amount to interrogation. See *Rhode Island* v. *Innis*, supra, 446 U.S. 300–301 (police actions amount to interrogation only if reasonably likely to elicit incriminating response from suspect).[3] Far from

---

[3] The majority attempts to explain away Guzda's instruction to the defendant to "be quiet" by contending that this instruction was "meaningless to the defendant because he had not been advised that, pursuant to *Miranda*, anything further that he said could be used against him." Footnote 13 of the majority opinion. I cannot agree with this statement for two reasons. First, I strongly disagree that this instruction could have been meaningless to the defendant. Nothing in the record suggests that the defendant was unable to understand the English language or that he was in any way unable to hear or comprehend this instruction as a result of a mental or physical impairment. I cannot accept the majority's suggestion that an unimpaired, English speaking adult could not have understood the meaning of the command, "be quiet," simply because the police did not also explain his *Miranda* rights. A more reasonable reading of the record is that the defendant understood Guzda's command but nevertheless voluntarily chose to disobey it. When a suspect's voluntary statement results from his own will and not from interrogation, the fifth amendment, which bars only *compelled* self-incrimination, simply is not implicated. See *Miranda* v. *Arizona*, supra, 384

demonstrating that the police failed to honor the defendant's rights, as the majority concludes, Guzda's statements demonstrated that the officers were doing more to end the interrogation and to honor the defendant's desire to remain silent than the defendant was doing.

The fact that the officers did not leave the room or did not attempt to get the defendant an attorney or tell him that they would obtain one for him does not indicate that the interrogation had not ceased or that the officers had failed to honor the defendant's invocation of his rights. Although these actions may be *sufficient* to terminate an interrogation, neither this court nor the United States Supreme Court ever has stated that such actions by the police are *necessary*. Indeed, this court previously has determined that an interrogation had ceased when the suspect invoked her rights to remain silent and to an attorney, and the officer, in response, simply ceased any questioning about the alleged crime. *State* v. *Canales*, supra, 281 Conn. 587–89.[4] This conclu-

U.S. 478. Second, there is no requirement that the police warn a suspect that statements that he volunteers to the police may be used against him in court before those statements will be admissible. See id. If the police tell a suspect to "be quiet" and that any conversation is over, and the suspect chooses to speak anyway, there simply is no reason to exclude the suspect's statement from evidence, and doing so will not further any of the goals of the *Miranda* decision or the fifth amendment.

[4] The majority attempts to distinguish *Canales*, in which this court concluded that interrogation ended when the police stopped questioning a defendant about the crime; see *State* v. *Canales*, supra, 281 Conn. 587–89; from the present case on the basis that the defendant in *Canales* (1) was advised of her rights under *Miranda*, (2) initiated the discussion, and (3) waived her rights. See footnote 13 of the majority opinion. These factors, however, are irrelevant to an analysis of whether the police have interrogated a suspect. Whether the police are engaging in interrogation depends only on whether the actions or words of the police are reasonably likely to elicit an incriminating response from the suspect and does not depend on whether the suspect was aware of or waived his rights. See *Rhode Island* v. *Innis*, supra, 446 U.S. 300–301. The fact that the defendant in *Canales* was advised of her *Miranda* rights and subsequently waived them by making incriminating statements had nothing to do with our conclusion in that case that the interrogation had ceased. Instead, we concluded that the interrogation in *Canales* had ceased as soon as the defendant invoked her rights and the

sion is consistent with case law from other jurisdictions. See, e.g., *Simpson* v. *Jackson*, supra, 615 F.3d 431 (police not required to leave interrogation room after suspect invokes right to remain silent); *McGowan* v. *Miller*, 109 F.3d 1168, 1170–71, 1175 (7th Cir. 1997) (fact that detective remained with suspect after suspect invoked his right to counsel did not amount to interrogation); *United States* v. *Avery*, 717 F.2d 1020, 1024–25 (6th Cir. 1983) (no *Miranda* violation when officer remained with suspect and asked routine booking questions after suspect invoked his right to remain silent), cert. denied, 466 U.S. 905, 104 S. Ct. 1683, 80 L. Ed. 2d 157 (1984); *State* v. *Brown*, 287 Ga. 473, 478–79, 697 S.E.2d 192 (2010) (rejecting argument that act of officers in remaining in room with suspect after he invoked his rights is interrogation and impermissible under *Miranda*). Finally, the fact that the officers continued to look at the defendant while in the interview room certainly does not amount to continued interrogation. Indeed, the police would be remiss in their duties not to watch a suspect in their custody who is outside of a controlled detention area. For the foregoing reasons,

officer stopped questioning her about the alleged murder. See *State* v. *Canales*, supra, 587–89. We did not indicate that anything more was necessary to demonstrate that an interrogation had ended, and, in fact, this court rejected the claim of the defendant in *Canales* that the officer was required to tell her that the interrogation had ended. See id., 589–90. The factors that the majority cites to distinguish *Canales* simply are not relevant to determining whether police conduct amounts to interrogation. Therefore, the majority's reliance on these factors in distinguishing *Canales* is not only misplaced, but is misleading.

Furthermore, I note that *Miranda* does not require a suspect to waive his rights before making a voluntary statement that is not the product of interrogation because *Miranda* does not prohibit a suspect from making voluntary statements after invoking his rights; rather, it only prohibits the police from engaging in further interrogation of the suspect unless the suspect waives his rights. See *Miranda* v. *Arizona*, supra, 384 U.S. 473–74, 478. Because I would conclude that the defendant in the present case was not being interrogated when he made his first and second statements, it is unnecessary for the state to show that the defendant waived his rights before making those voluntary statements.

I would conclude that the initial interrogation in the present case ceased when the defendant invoked his rights and that the police not only stopped their questioning but attempted to silence the defendant when he defied his previously expressed desire to remain silent. I therefore cannot agree with the majority's conclusion that the interrogation in the present case did not cease, that the officers did not honor the defendant's rights and that all of the defendant's statements therefore must be suppressed.[5]

---

[5] I respectfully note that, although the majority concludes that the interrogation in the present case never ceased, the majority cites no authority to support its conclusion, does not explain what is necessary to demonstrate that an interrogation has ended, and does not provide any rule or principle to guide courts when addressing this issue. The majority concludes that the defendant's "request to remain silent was not scrupulously honored because no steps were undertaken to conclude the interrogation or belatedly advise the defendant of his *Miranda* rights." Text accompanying footnote 12 of the majority opinion. The majority does not, however, explain how the actions of the officers after the defendant invoked his rights amounted to interrogation. Although the majority states that "the officers, in response to the defendant's attempt to invoke his right[s] to remain silent and [to] have counsel present, simply told the defendant to sit there and [to] wait to be booked, and then stared at the defendant in silence"; footnote 13 of the majority opinion; the majority does not explain how the fact that the officers continued to sit with the defendant in silence was something that the police should have reasonably known was likely to elicit an incriminating response.

Furthermore, although the majority concludes that the interrogation in the present case never ceased, the majority does not explain what the officers were required to do to end the interrogation. Moreover, the majority fails to explain or provide any authority to demonstrate why the cessation of questioning, together with the admonition to "be quiet" and the statement to the defendant that any conversation was over, was insufficient to demonstrate to the defendant that the interrogation had ended. It strains reason to conclude that Guzda's statements informing the defendant that he was not to speak and that the conversation was over were reasonably likely to elicit a response or somehow meant that the conversation was continuing. Instead, the case law previously discussed demonstrates that the police simply must cease any interrogation—and nothing more—to demonstrate that an interrogation has ended. Insofar as the majority departs from the case law on this issue, it gives no explanation for doing so. For these reasons, the majority, in my view, does not give adequate guidance to courts or to law enforcement officials as to what is required to end an interrogation and inserts unnecessary confusion into the jurisprudence on this subject.

## II

### WHETHER THE DEFENDANT'S STATEMENTS MUST BE SUPPRESSED

Although I would not exclude the statements from evidence for the reasons stated in the majority opinion, I must separately consider whether the statements are admissible or whether they must be suppressed on a different basis. Because the defendant's second statement—that he was not a murderer and that he and his accomplice went to Stamford on the day in question only to look for work—repeated everything that the defendant said in his first statement—that he was not a murderer—and because I would conclude that the second statement is admissible, it is unnecessary to analyze the defendant's first statement separately. I therefore analyze only the admissibility of the defendant's second statement and his narrative statement. For the reasons that follow, I would conclude that the defendant's second statement is admissible but that his narrative statement should be suppressed.

### A

### Second Statement

The admissibility of the defendant's second statement depends on whether the statement resulted from an improper interrogation and whether the statement was voluntarily made by the defendant. If the police engage in custodial interrogation of a suspect without first providing the warnings required by *Miranda*, a court must presume that any statement obtained from the suspect as a result of the unwarned interrogation was compelled, and the statement must be suppressed. See, e.g., *Oregon* v. *Elstad*, 470 U.S. 298, 307, 105 S. Ct. 1285, 84 L. Ed. 2d 222 (1985); cf. *Miranda* v. *Arizona*, supra, 384 U.S. 475–76. If, however, a suspect makes a subsequent statement that is not in response to an improper interro-

gation but is, instead, voluntarily made after interrogation has ceased, the statement may be admissible notwithstanding the prior *Miranda* violation. See *Oregon* v. *Elstad*, supra, 309 ("[alt]hough *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn . . . solely on whether it is knowingly and voluntarily made"); see also *Rhode Island* v. *Innis*, supra, 446 U.S. 299–300 ("Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. *The fundamental import of the privilege [against self-incrimination] while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated. . . .* Volunteered statements of any kind are not barred by the [f]ifth [a]mendment and their admissibility is not affected by [*Miranda*]." [Emphasis in original; internal quotation marks omitted.]), quoting *Miranda* v. *Arizona*, supra, 478.

The admissibility of a suspect's voluntary statements following statements taken in violation of *Miranda* is not "tainted" or affected by the prior, improper interrogation when the police do not actually coerce or compel the subsequent statements. See *Oregon* v. *Elstad*, supra, 470 U.S. 307–10; see also *Dickerson* v. *United States*, 530 U.S. 428, 441, 120 S. Ct. 2326, 147 L. Ed. 2d 405 (2000). It is important to note that the exclusionary rule and the related "fruit of the poisonous tree" doctrine,[6]

---

[6] The exclusionary rule is intended to "make effective the fundamental constitutional guarantees of sanctity of the home and inviolability of the person . . . ." (Citation omitted.) *Wong Sun* v. *United States*, 371 U.S. 471, 484, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963). To protect this interest, the exclusionary rule requires the suppression of all evidence obtained as a result of an illegal search and "is calculated to prevent, not to repair. Its purpose is to deter . . . by removing the incentive to disregard it." (Internal quotation marks omitted.) *Brown* v. *Illinois*, 422 U.S. 590, 599–600, 95 S. Ct. 2254, 45 L. Ed. 2d 416 (1975).

which generally are applied in the fourth amendment context, are not applicable to *Miranda* violations when the police do not actually compel the suspect's statements or engage in intentional misconduct. See *Oregon* v. *Elstad*, supra, 306 ("a procedural *Miranda* violation differs in significant respects from [a] [violation] of the [f]ourth [a]mendment, which ha[s] traditionally mandated a broad application of the 'fruits' doctrine"); see also *Missouri* v. *Seibert*, 542 U.S. 600, 618–19, 124 S. Ct. 2601, 159 L. Ed. 2d 643 (2004) (Kennedy, J., concurring). The *Miranda* rule is prophylactic in nature, intended to protect the accused's right not to be compelled to be a witness against himself. E.g., *New York* v. *Quarles*, 467 U.S. 649, 654, 104 S. Ct. 2626, 81 L. Ed. 2d 550 (1984). In *Miranda*, the court recognized that, even in the absence of actual compulsion by the police, "the possibility of coercion inherent in custodial interrogations unacceptably raises the risk that a suspect's privilege against self-incrimination might be violated." *United States* v. *Patane*, 542 U.S. 630, 639, 124 S. Ct. 2620, 159 L. Ed. 2d 667 (2004) (opinion announcing judgment). To guard against this risk, *Miranda* requires that police comply with certain prophylactic procedures when interrogating a suspect such that the failure to comply creates a presumption of compulsion as to any statements obtained from the suspect during the improper interrogation, even if there is no evidence that the police actually compelled the suspect's statements. See *Oregon* v. *Elstad*, supra, 307. Because a *Miranda* violation may result in the suppression of statements that are otherwise voluntarily made by the suspect, the presumption of compulsion extends *only* to those statements made during an improper interrogation and not to the suspect's subsequent, voluntary statements, as long as the police have not actually engaged in coercive or improper tactics. See id., 318 ("there is no warrant for presuming coercive effect [when] the suspect's

initial inculpatory statement, [al]though technically in violation of *Miranda,* was voluntary"); *State* v. *Roseboro,* 221 Conn. 430, 444, 604 A.2d 1286 (1992) ("Having concluded that the defendant's initial statements to the police were voluntary, although procured in violation of his *Miranda* rights, the trial court was justified in concluding that the *Miranda* violations did not taint the admissibility of his subsequent statements. As long as all of the statements were voluntarily made, the fact that the police procured those statements in violation of the defendant's *Miranda* rights does not create a presumption that the police acted coercively."). But cf. *Missouri* v. *Seibert,* supra, 542 U.S. 604–605, 617 (requiring suppression of subsequent, voluntary confession when police intentionally violated *Miranda* in obtaining initial confession).

Furthermore, courts have declined to apply the "fruit of the poisonous tree" doctrine to *Miranda* violations when there is no evidence of actual coercion or intentional police misconduct because suppression of a suspect's subsequent, voluntary statements would not serve the two primary goals of the *Miranda* decision: to deter police misconduct and to ensure the trustworthiness of evidence at trial. See, e.g., *Oregon* v. *Elstad,* supra, 470 U.S. 308 ("the absence of any coercion or improper tactics undercuts the twin rationales—trustworthiness and deterrence—for a broader rule"); cf. *United States* v. *Pettigrew,* 468 F.3d 626, 635 (10th Cir. 2006) (concluding that goals of *Miranda* require that "[t]he unwarned confession taken in violation of *Miranda* . . . be suppressed" but that "it does not necessarily follow that every subsequent voluntary statement made by a suspect must be suppressed as well"), cert. denied, 549 U.S. 1242, 127 S. Ct. 1343, 167 L. Ed. 2d 138 (2007).

Applying these principles, courts deciding cases with facts similar to those of the present case have admitted

unwarned statements made by a suspect after an improper interrogation when the government proves that (1) although the police violated the requirements of *Miranda*, the police did not engage in coercive behavior or improper interrogation techniques, (2) any initial statements made by the suspect during the improper interrogation were voluntary, and (3) the subsequent unwarned statements that the government seeks to admit were voluntarily made and not made during an improper interrogation. See, e.g., *United States* v. *Pettigrew*, supra, 468 F.3d 636 ("statements made without *Miranda* warnings but not in response to police interrogation are admissible even though they followed an earlier voluntary statement made in violation of *Miranda*"); *United States* v. *Abdulla*, 294 F.3d 830, 834–37 (7th Cir. 2002) (*Miranda* violation does not taint subsequent, voluntary statements, and statements were admissible even though they were not preceded by *Miranda* warnings because they were voluntary); *Medeiros* v. *Shimoda*, 889 F.2d 819, 823–26 (9th Cir. 1989) (because subsequent statement was voluntary, it was admissible, notwithstanding voluntary but unwarned prior statement), cert. denied, 496 U.S. 938, 110 S. Ct. 3219, 110 L. Ed. 2d 666 (1990). In determining whether a suspect's subsequent statement was voluntary, the fact finder must consider the totality of the circumstances surrounding the encounter with the police. See, e.g., *Oregon* v. *Elstad*, supra, 470 U.S. 318; *United States* v. *Pettigrew*, supra, 637; *United States* v. *Abdulla*, supra, 836; *Medeiros* v. *Shimoda*, supra, 824. "[T]he test [for determining] voluntariness is whether an examination of all the circumstances discloses that the conduct of law enforcement officials was such as to overbear [the suspect's] will to resist and bring about confessions not freely self-determined . . . . Furthermore, the scope of review is plenary on the ultimate question of voluntariness, but the trial court's findings regarding the circum-

stances surrounding the [suspect's] questioning and confession are findings of fact that will not be overturned unless they are clearly erroneous." (Citation omitted; internal quotation marks omitted.) *State* v. *Azukas*, 278 Conn. 267, 290, 897 A.2d 554 (2006).

In light of these principles, I would conclude that the defendant's second statement is admissible. The trial court in the present case expressly found that (1) the officers were not "trying to . . . use any psychological ploys," (2) "[a]ll of the statements of the defendant were of his own mind and volition, and not the result of anything [the officers] did," and (3) "[t]here was no compulsion . . . ." The record adequately supports these findings, and the foregoing requirements are met in this case. First, although the officers violated *Miranda* by not giving the required warnings to the defendant, there is no evidence that the officers engaged in any coercive conduct or intentional misconduct when telling the defendant that they wanted to give him an opportunity to tell his side of the story. Second, the defendant's initial response to the improper interrogation, that is, that he wanted to remain silent and to consult with an attorney, was freely given and resulted from the defendant's own desire not to speak with the officers. Third, it is clear that when the defendant made his second statement, he was under no compulsion to speak, and, therefore, this statement was voluntary and not the product of any interrogation. By the time the defendant made his second statement, he had invoked his rights to remain silent and to consult with an attorney, the officers had acknowledged the defendant's invocation and told him that he would be booked soon, and the officers had ceased questioning. Furthermore, the officers did not ask the defendant any further questions, and, when the defendant tried to speak by making his first statement, the officers specifically instructed him to "be quiet," that they could

not talk to him, and that there would be no conversation. When a suspect is specifically told by the police to "be quiet," it would strain the bounds of reason to conclude that whatever the suspect says in defiance of that command is anything but a product of the suspect's own will. For these reasons, I would conclude that the trial court properly concluded that the police did not engage in any coercive behavior or intentional misconduct and that the defendant's second statement was the product of his own will. Therefore, I would conclude that the defendant's second statement was properly admitted at trial.

Although I recognize that the second statement was made in close temporal proximity to the improper interrogation, this fact does not alter my conclusion that the trial court properly found that the defendant's second statement was voluntary. Because an improper interrogation does not taint subsequent statements when there is no evidence of compulsion or intentional misconduct by the police, the passage of time between an improper interrogation and the subsequent statements is only one factor of many that a court may consider in reviewing the totality of the circumstances. In light of the other facts of the present case, including the absence of any coercion, the fact that the defendant readily invoked and then breached his desire to remain silent, and the fact that the police attempted to silence the defendant when he chose to forgo his right to remain silent, it was not clearly erroneous for the trial court to conclude that the defendant's second statement was voluntary and not a product of interrogation. See, e.g., *United States* v. *Daniels*, United States District Court, Docket No. 09-569-01 (E.D. Pa. May 27, 2010) (admitting subsequent, voluntary statements made only minutes after statements made in response to improper interrogation during continuous encounter with police); *United States* v. *Richardson*, 700 F. Sup. 2d 1040, 1053–54 (N.D.

Ind. 2010) (admitting subsequent, voluntary statements made close in time to statement made in response to improper interrogation); *United States* v. *Mitchell*, United States District Court, Docket No. 06-20034-01-JWL (D. Kan. November 8, 2006) (admitting subsequent, voluntary statements made immediately after initial response to improper interrogation during police interview); cf. *Medeiros* v. *Shimoda*, supra, 889 F.2d 824–25 (short time between prior confession to police during improper interrogation and suspect's subsequent statements did not render subsequent statements involuntary). Finally, the fact that a suspect's subsequent statement is responsive to a prior, improper question by the police also does not render the suspect's subsequent statement involuntary when the totality of the circumstances demonstrates that the suspect made the subsequent responsive statements voluntarily, without any compulsion by the police. See, e.g., *United States* v. *Abdulla*, supra, 294 F.3d 832, 836–37 (suspect's subsequent statements that mimicked his initial statement made in response to improper interrogation were voluntary); *United States* v. *Mitchell*, supra (suspect's subsequent statements were voluntary even though they were responsive to initial, improper interrogation because there was no indication that suspect had been compelled to make them).

## B

### Narrative Statement

I would conclude, however, that the defendant's narrative statement resulted from improper police conduct, in violation of *Miranda* and *Edwards*. For this reason, I agree with the majority's conclusion that the defendant's narrative statement must be suppressed. Because I disagree, however, with the majority's conclusion that the initial, improper interrogation never ceased, I reach my conclusion on a different basis.

Although the initial, improper interrogation ended when the defendant invoked his rights to remain silent and to counsel, the defendant's narrative statement resulted from further, improper interrogation, and, therefore, it must be suppressed pursuant to *Edwards* v. *Arizona*, supra, 451 U.S. 484–85, which prohibits police from engaging in further interrogation of a suspect after the suspect has invoked his right to counsel.

The *Edwards* rule is implicated when the suspect (1) invokes his right to counsel, and (2) is subjected to "further interrogation" by the police. Id., 484. The defendant's narrative statement in the present case implicates this doctrine. By the time the defendant made his narrative statement, he previously had invoked his right to counsel. After the defendant made his first and second statements, the officers told the defendant that they would like to speak with him and asked whether he wanted to waive his rights and to speak with them without counsel. The police also asked whether the defendant minded if they wrote down what the defendant would say. The record demonstrates that these statements were posed to the defendant in a manner that indicated that the officers desired to question him to obtain a statement about the murder and conveyed their desire that he waive his rights. Because these questions were reasonably likely to elicit an incriminating response, I would conclude that the defendant made his narrative statement after further interrogation, which occurred after he had invoked his right to counsel. Therefore, to admit the defendant's narrative statement, the state must demonstrate that there was compliance with *Edwards*.[7]

---

[7] In reaching this conclusion, I am mindful of the prophylactic nature of the *Edwards* rule, which was intended to prevent the police from undermining or interfering with a suspect's invocation of his right to counsel by subsequently influencing him to change his mind. See *Smith* v. *Illinois*, supra, 469 U.S. 98 (explaining that *Edwards* rule was designed to prevent police from engaging in any " 'badger[ing]' or 'overreaching'—explicit or subtle, deliberate or unintentional—[that] might otherwise wear down the accused and

Applying the requirements of *Edwards* to the facts of the present case, I am persuaded that the narrative statement should have been suppressed. In accordance with *Edwards*, if statements that the defendant made in response to further interrogation are to be admissible, the state must prove that the defendant (1) initiated, and did not merely continue, the discussion with police, and (2) knowingly and intelligently revoked his earlier invocation of his right to counsel. See, e.g., *Oregon* v. *Bradshaw*, 462 U.S. 1039, 1044–45, 103 S. Ct. 2830, 77 L. Ed. 2d 405 (1983) (opinion announcing judgment). The state cannot meet its burden of establishing that the defendant's waiver of his right to counsel was knowing and intelligent because the police never informed the defendant of his *Miranda* rights.[8] For this reason, I would conclude that the defendant's narrative statement resulted from further interrogation by the police in violation of *Edwards* and should have been suppressed.

Finally, I agree with the majority's conclusion that the admission of the defendant's narrative statement constituted harmful error, and this is not altered by my previous conclusion that the defendant's second statement was properly admitted. Although the defendant admitted in his second statement that he had gone to Stamford, presumably on the day of the murder, to look for work, it did not contain the kind or degree of detailed information that the defendant provided in his narrative statement. Significantly, the second statement did not contain the specific admission by the defendant that he had gone to the victim's home on the day of the murder, as he had admitted in his narrative statement. In view of the fact that the state relied heavily on the

persuade him to incriminate himself notwithstanding his earlier request for counsel's assistance"); see also *Oregon* v. *Bradshaw*, 462 U.S. 1039, 1044, 103 S. Ct. 2830, 77 L. Ed. 2d 405 (1983) (opinion announcing judgment).

[8] Because the state clearly cannot meet its burden on this issue, it is unnecessary to examine whether the defendant had reinitiated the discussion.

admissions that were set forth exclusively in the defendant's narrative statement, I agree with the majority's conclusion that the admission of the defendant's narrative statement was not harmless beyond a reasonable doubt.

Accordingly, I concur in the majority opinion insofar as the majority reverses the defendant's conviction and remands the case for a new trial, concludes that the defendant's constitutional right against double jeopardy was not violated and concludes that the defendant's narrative statement should have been suppressed. I dissent from the majority opinion insofar as the majority concludes that the officers did not honor the defendant's invocation of his rights, that the improper interrogation never ceased, and that the defendant's first and second statements should have been suppressed.