******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v*. DANTE SMITH
(SC 19322)

Rogers, C. J., and Palmer, Zarella, Eveleigh, McDonald, Espinosa and
Vertefeuille, Js.

*Argued December 16, 2015—officially released May 10, 2016*

*Raymond L. Durelli*, assigned counsel, for the appellant (defendant).

*Laurie N. Feldman*, special deputy assistant state's attorney, with whom were *Russell C. Zentner*, senior assistant state's attorney, and, on the brief, *Peter A. McShane*, state's attorney, for the appellee (state).

*Opinion*

ROGERS, C. J. This certified appeal requires us to construe the scope of the public safety exception to *Miranda*[1] as articulated in *New York* v. *Quarles*, 467 U.S. 649, 657, 104 S. Ct. 2626, 81 L. Ed. 2d 550 (1984). The defendant, Dante Smith, appeals from the judgment of the Appellate Court affirming the judgment of conviction, rendered after a jury trial, of two counts of assault in the second degree in violation of General Statutes § 53a-60 (a) (1). See *State* v. *Smith*, 149 Conn. App. 149, 160, 86 A.3d 524 (2014). The defendant claims that the trial court improperly denied his motion to suppress his statements made (1) at the crime scene and (2) later at the police station during his booking. Because we conclude that the public safety exception applied, we affirm the judgment of the Appellate Court.

The following facts, which the jury reasonably could have found, and procedural background are relevant to the defendant's claim. "On the night of March 9, 2010, the victim, Justin Molinaro, was driving his Audi [A6] in the vicinity of Maplewood Terrace, a public housing complex in Middletown known to be a high crime area. As he drove past the complex, two unidentified men flagged him down and informed him that his cousin, the defendant, wanted to speak with him. The victim drove his car into a parking lot at Maplewood Terrace, where he saw the defendant get into the backseat of another car. The victim exited his Audi and asked the defendant what he wanted. While the victim was waiting for the defendant, he saw Tykeem Privott, who was also in the car with the defendant. The victim noticed that Privott had a supply of marijuana on his lap and began to chastise Privott for his drug use. As the victim talked to Privott, the defendant got out of the car wielding a Louisville Slugger aluminum baseball bat, which he used to strike the victim on the head. The blow knocked the victim to the ground, and the victim asked the defendant, '[W]hat the hell is going on?' The other occupants of the vehicle then exited the car and began to kick and punch the victim as he lay on the ground.

"Privott picked up the Louisville Slugger and swung it at the victim, striking him on the back of his neck. The defendant choked the victim and told him to 'go to sleep, motherfucker.' The defendant ordered his accomplices to go through the victim's pockets, which they did, taking his cell phone, wallet, and the keys to the Audi.

"As the assailants left, the victim stumbled to his feet. He found his car keys in a patch of grass near the parking lot. The defendant, however, reappeared and said, 'What, you didn't have enough yet?' and pointed a black handgun in the victim's face. The defendant took the keys to the Audi and said, 'This shit is mine.'

The victim then saw Privott, who was now also holding a handgun. Privott asked the defendant, 'Do you want me to pop this motherfucker?' The defendant then turned and left in the Audi.

"The victim walked to a nearby house and called 911. He reported to the dispatcher the details of the assault and carjacking. While on the telephone with the dispatcher, the victim saw the Audi double back, headed in the direction of Maplewood Terrace. He told the dispatcher that six people were returning in his car with guns, and he asked the dispatcher to send help.

"The police arrived on the scene, and police officers attended to the victim [who flagged them down]. One police officer later stated that the victim looked 'like an alien' because the area around his left eye was bloodied, swollen, and disfigured. The swelling around the victim's eyes rendered him nearly blind. The victim was gasping for breath and making statements to the effect of, 'I don't want to die.' When asked what happened, the victim responded, 'Dante Smith and Tykeem Privott did this. Dante had a bat and Tykeem had a gun.' The victim faded in and out of consciousness and his respiration was irregular. Emergency workers arrived and transported him to the hospital.

"After treating the victim, the police processed the crime scene and secured the area surrounding Maplewood Terrace, where a crowd had gathered. Approximately forty minutes after the assault took place, a black male calmly approached [Detectives] Dan Smith and Nicholas Puorro [of the Middletown Police Department]. As he drew near, he stated, 'I am Dante Smith, my grandmother said the police were looking for me.'

"On the basis of the information provided by the victim, the police had reason to believe that the defendant was involved in an assault that involved both firearms and a baseball bat. The police informed the defendant that they had to place him in handcuffs for safety reasons, and that they had an obligation to protect both themselves and the surrounding crowd. The defendant stated that he understood, and that he also understood that he was not under arrest.

"The police asked the defendant whether he had any weapons; he replied that he did not. The police frisked the defendant, but found no weapons. The defendant was asked whether he knew where the weapons were, to which he responded, 'What weapons?' When asked about Privott, the defendant denied knowing him. The defendant was then asked what happened that evening. The defendant stated that he had been involved in a fight with the victim, and that he and the victim were cousins. He told the police that the victim had called him and wanted to go for a ride. The defendant stated that once he was in the car with the victim, the victim wanted to go and buy drugs. The defendant stated that

he did not want to buy drugs and wanted to get out of the car. When the victim did not stop the vehicle, the defendant stated that he punched the victim in the face several times.

"Upon hearing the defendant's narrative, the police informed him that it appeared as if the victim had been struck with a baseball bat, and that the injuries occurred to the left side of his face, which was inconsistent with the defendant's story that the victim was driving. The defendant grew frantic and stopped cooperating with the police, stating, 'Do what you got to do, arrest me, arrest me.' The defendant was placed under arrest and transported to police headquarters." Id., 151–53. At the police station, the defendant repeated the statements he made to the police at the crime scene after receiving *Miranda* warnings. Id., 154.

"The defendant was charged in a seven count amended information, which included two counts of assault in the first degree in violation of General Statutes § 53a-59 (a) (1). The defendant thereafter filed a motion to suppress the statements he made to the police at the crime scene and during his booking at the police station, arguing that they were inadmissible pursuant to *Miranda* . . . . A hearing on the motion to suppress was held during which the defendant argued that the statements he made to the police while he was handcuffed at the crime scene should be suppressed because he was in police custody and interrogated without having received *Miranda* warnings." (Citation omitted.) Id., 153–54. The trial court denied the motion, finding in its memorandum of decision both that "the *Terry*[2] stop [of the defendant] was amply justified and the length and intrusiveness of the stop were lawful pursuant to *Terry*" and, despite the defendant's argument that he should have been given his *Miranda* rights or had the handcuffs removed immediately after the pat down revealed no weapons, that "under all the circumstances, the investigative detention was properly continued, especially in view of the officers' concerns for public safety and their own safety and the extremely brief duration, one to two minutes at most."[3] "The [trial] court also found, with respect to the statements made at the police station during his booking, that the defendant was properly advised of his *Miranda* rights and that he waived his rights when, during his booking, he repeated the statement[s] he made to the police at the crime scene.

"Following a trial, the jury found the defendant guilty of two counts of the lesser included offense of assault in the second degree in violation of § 53a-60 (a) (1), and rejected the defendant's claim of self-defense. The defendant was found not guilty of all other charges. The court merged the two assault convictions and sentenced the defendant to a total effective term of five years incarceration, execution suspended after forty months,

followed by five years probation with special conditions." (Citation omitted.) *State* v. *Smith*, supra, 149 Conn. App. 154.

On appeal to the Appellate Court, the defendant argued that the trial court's denial of his motion to suppress his statements to the police violated his fifth amendment rights and that he was subjected to custodial interrogation without *Miranda* warnings at the crime scene. Id. The Appellate Court disagreed and held that the *Quarles* public safety exception did apply without deciding whether the defendant was in custody for the purposes of *Miranda*. Id., 155, 159. Consequently, because the questioning at the crime scene of the defendant was justified, the Appellate Court found the doctrine articulated in *Missouri* v. *Seibert*, 542 U.S. 600, 616–17, 124 S. Ct. 2601, 159 L. Ed. 2d 643 (2004), which requires the suppression of a subsequent, voluntary confession when the police intentionally violate *Miranda* in obtaining the initial confession, to be inapplicable to the statements made later at the police station during the defendant's booking. *State* v. *Smith*, supra, 149 Conn. App. 159–60. This certified appeal followed.[4]

On appeal to this court, the defendant contends that he was not lawfully detained under *Terry* and was, instead, the subject of custodial interrogation at the crime scene. He further contends that the public safety exception did not apply to the interrogation, and that his statements were inadmissible. Due to the impropriety of the crime scene interrogation, the defendant argues that his statement made at the police station was also inadmissible under *Seibert*. The state counters that the public safety exception applied and thus a determination of custody is unnecessary, and that the propriety of police conduct at the crime scene defeats the *Seibert* claim with regard to the defendant's statements at the police station.

We conclude that the public safety exception applied and, accordingly, we need not decide whether the defendant was in custody for the purposes of *Miranda*.[5] We further conclude that, because the crime scene questioning was legitimate, the defendant's argument regarding the police station statements fails as the *Seibert* doctrine is inapplicable. Accordingly, we affirm the judgment of the Appellate Court.

"Our standard of review of a trial court's findings and conclusions in connection with a motion to suppress is well defined. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . ." (Internal quotation marks omitted.) *State* v. *Betances*, 265 Conn. 493,

500, 828 A.2d 1248 (2003).

Normally, "[w]hen a suspect is taken into custody, the *Miranda* warnings must be given before any interrogation takes place. . . . The primary purpose of the *Miranda* warnings is to ensure that an accused is aware of the constitutional right to remain silent before making statements to the police. . . . Two threshold conditions must be satisfied in order to invoke the warnings constitutionally required by *Miranda*: (1) the defendant must have been in custody; and (2) the defendant must have been subjected to police interrogation. . . . The defendant bears the burden of proving custodial interrogation. . . . [T]he definition of interrogation [for purposes of *Miranda*] can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response. . . . The test as to whether a particular question is likely to elicit an incriminating response is objective; the subjective intent of the police officer is relevant but not conclusive and the relationship of the questions asked to the crime committed is highly relevant." (Citations omitted; emphasis in original; internal quotation marks omitted.) Id., 500–501. "[T]he ultimate determination . . . of whether a defendant already in custody has been subjected to interrogation . . . presents a mixed question of law and fact over which our review is plenary . . . ." (Internal quotation marks omitted.) *State* v. *Edwards*, 299 Conn. 419, 428, 11 A.3d 116 (2011).

There is an exception to the *Miranda* requirement, however, in certain situations where public safety concerns are implicated. The United States Supreme Court articulated the public safety doctrine in *New York* v. *Quarles*, supra, 467 U.S. 657, and "reasoned that the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the [f]ifth [a]mendment's privilege against self-incrimination." (Internal quotation marks omitted.) *State* v. *Betances*, supra, 265 Conn. 503. In those situations, the police officers' questions "must relate to an objectively reasonable need to protect the police or the public from any immediate danger . . . ." (Internal quotation marks omitted.) Id., quoting *New York* v. *Quarles*, supra, 659 n.8.

"In *Quarles*, a young woman approached two police officers in their patrol car and informed them that a man armed with a gun had just raped her. . . . She described her assailant and told the officers that the man had just entered a nearby supermarket. . . . The officers entered the supermarket, located a man, Benjamin Quarles, who matched the description given and apprehended him after a brief pursuit through the store. . . . One officer frisked Quarles and detected an empty shoulder holster before handcuffing him. . . . Before reading him his *Miranda* rights, the officer asked Quarles where the gun was, and Quarles responded,

the gun is over there. . . . Quarles subsequently was charged with criminal possession of a weapon. . . . The trial judge granted, and the New York Court of Appeals affirmed, Quarles' motion to suppress both the gun and the statement because the officer had not given him his *Miranda* warnings. . . .

"The United States Supreme Court, however, reversed the New York Court of Appeals' decision. . . . It held that both the statement and the gun were admissible under the public safety exception because the concern for public safety must be paramount to adherence to the literal language of the prophylactic rules enunciated in *Miranda*. . . . Furthermore, the court explained that the exception simply [frees officers] to follow their legitimate instincts when confronting situations presenting a danger to the public safety. . . . The court decline[d] to place officers . . . in the untenable position of having to consider, often in a matter of seconds, whether it best serves society for them to ask the necessary questions without the *Miranda* warnings and render whatever probative evidence they uncover inadmissible, or for them to give the warnings in order to preserve the admissibility of evidence they might uncover but possibly damage or destroy their ability to obtain that evidence and neutralize the volatile situation confronting them." (Citations omitted; internal quotation marks omitted.) *State* v. *Betances*, supra, 265 Conn. 502–503.

We agree with the Appellate Court that, based on all the surrounding circumstances, the public safety exception applied in the present case. On arrival at the scene of the assault, the police spoke to the victim, who was seriously injured and who made statements that he had been beaten with a baseball bat,[6] that a gun had been involved, and that six people had been involved, including the defendant. The victim had also told the dispatcher that six people were coming back to the scene with guns. *State* v. *Smith*, supra, 149 Conn. App. 152. At that point, the police had a legitimate concern that they were in a volatile situation involving both unsecured weapons and as many as five assailants who had just absconded in the vicinity of Maplewood Terrace. See id., 158. There were a number of individuals in the area at the time that had come out of their residences and gathered at the crime scene. Id. We therefore conclude, as the Appellate Court did, that the unaccounted for dangerous weapons and coassailants posed a threat to the public safety of innocent bystanders, the investigating officers, and the defendant himself. See id., 159, citing *New York* v. *Quarles*, supra, 467 U.S. 657, and *State* v. *Betances*, supra, 265 Conn. 504.

We further conclude that the specific questions that the police asked the defendant were permissible under the public safety exception. To determine whether the police questioning comported with the public safety

exception, we must ascertain whether the questions the police asked were "relate[d] to an objectively reasonable need to protect the police or the public from any immediate danger . . . ." (Internal quotation marks omitted.) *State* v. *Betances*, supra, 265 Conn. 503. These pre-*Miranda* questions "may not be investigatory in nature or designed solely to elicit testimonial evidence from a suspect." (Internal quotation marks omitted.) *United States* v. *Estrada*, 430 F.3d 606, 612 (2d Cir. 2005). Although the public safety exception is a "narrow" exception to *Miranda*; *State* v. *Betances*, supra, 503; "a question need not be posed as narrowly as possible, because [p]recision crafting cannot be expected in the circumstances of a tense and dangerous arrest. . . . Thus, a question that plainly encompasses safety concerns, but is broad enough to elicit other information, does not necessarily prevent application of the public safety exception when safety is at issue and context makes clear that the question primarily involves safety." (Citation omitted; internal quotation marks omitted.) *United States* v. *Estrada*, supra, 612.

After frisking the defendant and finding no weapons, the police asked him where the weapons were. The defendant concedes that if the public safety exception applies, then this question was reasonably grounded in public safety concerns. The police then asked the defendant about Privott, which the defendant argues was investigatory in nature. This question, however, directly related to their safety concerns, as the police had reason to believe that Privott was the person who was in possession of the gun and could be in the immediate area. See *New York* v. *Quarles*, supra, 467 U.S. 657 ("[s]o long as the gun was concealed somewhere in the supermarket, with its actual whereabouts unknown, it obviously posed more than one danger to the public safety: an accomplice might make use of it, a customer or employee might later come upon it").

Then the defendant was asked "what happened . . . ?"[7] Again the defendant challenges this as investigatory in nature. Puorro testified at the suppression hearing, however, that he asked the defendant if there were any weapons that they should be aware of around the complex because he was concerned about a civilian coming into the possession of a gun or weapon and then proceeded to ask him "what happened, if he knew anything, if he was involved in this assault because this is what the victim had said and [the defendant] said that he had been involved in an assault with [the victim], but he had not used any weapons." (Internal quotation marks omitted.) *State* v. *Smith*, supra, 149 Conn. App. 157 n.1.[8] Puorro further testified that "[t]he reason [the defendant] wasn't advised at the time is our concern was public safety and the exigency of the weapons being discarded in the area where all these civilians were now out watching. There were children around. Basically we just wanted to know if there [were] guns

in the area. We didn't care so much [about] the specifics, but if there [were] guns in the area that could harm us or civilians that were out there." Under these specific circumstances, it is reasonable to conclude that the question was focused on obtaining information about the unaccounted weapons and five other assailants still at large who could have been in the crowd. Thus, the overall nature and context of the questions related to the objectively reasonable need to protect the public from immediate danger. *State* v. *Smith*, supra, 157 n.1. Although the question was somewhat broad, "[p]recision crafting cannot be expected in the circumstances of a tense and dangerous arrest."[9] (Internal quotation marks omitted.) *United States* v. *Estrada*, supra, 430 F.3d 612.

The defendant's second claim is that, although the police read him his rights prior to his making incriminating statements at the police station, those statements are inadmissible pursuant to *Missouri* v. *Seibert*, supra, 542 U.S. 616–17. In *Seibert*, the United States Supreme Court held that if "the police deliberately violate *Miranda* in the first instance, and then obtain the same confession with proper *Miranda* warnings at a later time, the defendant's confession is tainted and inadmissible." *State* v. *Smith*, supra, 149 Conn. App. 159; see *Missouri* v. *Seibert*, supra, 617. Because we hold that the public safety exception applied to the police conduct at the crime scene, the doctrine in *Seibert* is inapplicable to the defendant's statements at the police station.[10]

The judgment of the Appellate Court is affirmed.

In this opinion PALMER, ZARELLA, EVELEIGH, ESPINOSA and VERTEFEUILLE, Js., concurred.

[1] *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[2] *Terry* v. *Ohio*, 392 U.S. 1, 27, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

[3] We note that several courts have held that the fact that a seizure of an individual did not rise to the level of a de facto arrest under *Terry* does not necessarily mean that the seizure did not also constitute custody for purposes of *Miranda*. See, e.g., *United States* v. *Newton*, 369 F.3d 659, 673, 675–79 (2d Cir.) (citing cases and holding that, even though defendant was in handcuffs, *Terry* stop of defendant was reasonable, but he was in custody for *Miranda* purposes, and nevertheless public safety exception applied), cert. denied, 543 U.S. 947, 125 S. Ct. 371, 160 L. Ed. 2d 262 (2004). We further note that, if a proper *Terry* stop constitutes custody for *Miranda* purposes, the public safety exception to *Miranda* would not permit the police to ask the seized person any and all questions. Rather, as we discuss later in this opinion, to come within the exception, questions must "relate to an objectively reasonable need to protect the police or the public from any immediate danger . . . ." (Internal quotation marks omitted.) *State* v. *Betances*, 265 Conn. 493, 503, 828 A.2d 1248 (2003), quoting *New York* v. *Quarles*, supra, 467 U.S. 659 n.8.

Although the trial court focused primarily on the reasonableness of the defendant's seizure under *Terry*, the Appellate Court characterized the trial court's ruling as a finding that "the defendant was not in custody at the crime scene, and alternatively, that the public safety exception to *Miranda* applied." *State* v. *Smith*, supra, 149 Conn. App. 154. We agree with the Appellate Court that the trial court did find that there were legitimate public safety concerns and, although the trial court did not make express findings that the specific questions were related to an objectively reasonable need to protect the public or the police, we may undertake that analysis because it is a mixed question of law and fact, and we have factual findings and

undisputed testimony concerning the questions and manner of the interrogation. We emphasize that in these circumstances, the trial court ordinarily should perform a *Miranda* custody analysis and not rely solely on *Terry* for custody or, alternatively, examine the questions the officers asked for application of the public safety exception, if custody is assumed. See *State* v. *Mangual*, 311 Conn. 182, 193–95 and nn.11 and 12, 85 A.3d 627 (2014) (recognizing that, based on reasoning from *Berkemer* v. *McCarty*, 468 U.S. 420, 439–40, 104 S. Ct. 3138, 82 L. Ed. 2d 317 [1984], not every seizure constitutes custody for purposes of *Miranda, Miranda* custody analysis involves initial inquiry into whether reasonable person would have thought he was free to leave, akin to *Terry* seizure analysis, but, if person is seized, custody analysis also involves additional inquiry of whether reasonable person would have understood his freedom of action to have been curtailed to degree associated with formal arrest [quoting *United States* v. *Newton*, supra, 369 F.3d 672]); see also *State* v. *Betances*, supra, 265 Conn. 503.

[4] This court granted the defendant's petition for certification to appeal, limited to the following issue: "Did the Appellate Court properly affirm the trial court's denial of the defendant's motion to suppress statements he made at the crime scene and at the police station?" *State* v. *Smith*, 311 Conn. 954, 97 A.3d 984 (2014).

[5] The defendant contends that the Appellate Court improperly declined to determine whether he was in custody before determining whether the public safety exception to *Miranda* applied. See *State* v. *Smith*, supra, 149 Conn. App. 155 ("[b]ecause we agree with the state that the public safety exception applies to the facts of this case, we do not need to decide whether the defendant was in custody for the purposes of *Miranda*"). We disagree. The Appellate Court properly assumed that the defendant was in custody because, if he was *not* in custody, *Miranda* would not apply in the first instance and the defendant could not prevail on his claim. Thus, the Appellate Court simply gave the defendant the benefit of the doubt, which we do as well.

[6] The defendant challenges the factual finding that a baseball bat is a dangerous instrument, but we do not find, under the circumstances, that this finding was clearly erroneous. Considering all the circumstances, the trial court could have found that the bat had recently been used as a dangerous instrument and that the public was in danger from it as well as the gun involved in the assault.

[7] The Appellate Court stated that the question posed to the defendant was " 'what happened here . . . ?' " *State* v. *Smith*, supra, 149 Conn. App. 157 n.1. Although this subtle difference does not affect our analysis, we refer to the question asked as "what happened" because it is more consistent with the record.

[8] The Appellate Court misstated that it was Detective Smith's testimony.

[9] "To be sure, the public safety exception does not permit officers to pose questions designed *solely* to elicit testimonial evidence from a suspect. . . . Thus, to fall within the exception, a question must have some rational relationship to defusing the perceived danger." (Citation omitted; emphasis in original; internal quotation marks omitted.) *United States* v. *Newton*, 369 F.3d 659, 679 n.8 (2d Cir.), cert. denied, 543 U.S. 947, 125 S. Ct. 371, 160 L. Ed. 2d 262 (2004). Thus, "what happened?" in a public safety situation will not always be considered related to public safety concerns. See *United States* v. *Estrada*, supra, 430 F.3d 612–14 ("[W]e expressly have not condoned the pre-*Miranda* questioning of suspects as a routine matter. . . . We reiterate, however, that the exception must not be distorted into a per se rule as to questioning people in custody . . . and emphasize that the exception will apply only where there are sufficient indicia supporting an objectively reasonable need to protect the police or the public from immediate harm." [Citations omitted; internal quotation marks omitted.]).

The concurrence suggests that our contextual approach may sanction a pretextual approach. To the contrary, our approach simply recognizes both "the need for flexibility in situations where the safety of the public and the officers are at risk . . . [and that] the public safety exception [is] a function of the facts of cases so various that no template is likely to produce sounder results than examining the totality of the circumstances in a given case." (Citation omitted; internal quotation marks omitted.) Id., 612. Moreover, in *Estrada*, one of the factors the court found persuasive was that "the objective facts did not suggest that the questioning was a subterfuge . . . designed solely to elicit testimonial evidence from a suspect . . . but instead that the questioning was generally targeted at a safety concern . . . ." (Citations omitted; internal quotation marks omitted.) *United States* v. *Ferguson*, 702

F.3d 89, 94 (2d Cir. 2012), quoting *United States* v. *Estrada*, supra, 430 F.3d 612, 613. While we are sensitive to the concerns the concurrence expresses, as in *Estrada*, "[t]here is no suggestion or facts in this case to indicate that the questions were a subterfuge for collecting evidence and were thus investigatory." *United States* v. *Estrada*, supra, 613. The trial court is in the best position to evaluate the credibility of the officers and identify those facts that could indicate subterfuge or not. Notwithstanding the concurrence's assumption that the other assailants had fled the scene, its assertion that they did not pose an imminent risk of harm forty to fifty minutes after the assault, and its observation that the police were able to manage the volatile situation without requesting that residents return to their homes the trial court nevertheless credited the testimony of the detectives and found that the overall detention was justified in view of the detectives' legitimate concerns for public safety at the time. See *United States* v. *Ferguson*, supra, 95–96 (applying public safety exception where 911 call was made approximately one hour before defendant's arrest and subsequent interrogation, yet, in that case, those "brief amounts of time did not diminish the officers' objectively reasonable need to protect the public from the realistic possibility that [the defendant] had hidden his gun in public, creating an imminent threat to public safety"). Because of the trial court's finding and because the questioning was generally targeted at a safety concern regarding unaccounted for weapons and assailants, we cannot say that, in this case, the questioning was a subterfuge. See *United States* v. *Simmons*, 661 F.3d 151, 156 (2d Cir. 2011) ("[w]e are not persuaded that this limited questioning was prohibitively 'investigatory in nature' or a subterfuge for collecting testimonial evidence").

[10] The trial court found that the defendant knowingly and intelligently waived his *Miranda* rights at the police station. The defendant does not challenge this finding.