******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* RAVON DONALD
(SC 19786)

Rogers, C. J., and Palmer, Eveleigh, McDonald, Espinosa and Robinson, Js.

*Argued January 20—officially released May 2, 2017*

*Robert O'Brien*, assigned counsel, with whom, on the brief, was *Christopher Duby*, assigned counsel, for the appellant (defendant).

*Kathryn W. Bare*, assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, and *Richard J. Rubino*, senior assistant state's attorney, for the appellee (state).

*Opinion*

ROGERS, C. J. The defendant, Ravon Donald, challenges the trial court's denial of his motion to suppress a signed, sworn statement he made to the police in which he confessed to committing a robbery and assault at a grocery store. The defendant claims that the trial court should have granted his motion to suppress his statement because the police initially questioned him concerning his knowledge of the robbery while he was in custody before they provided *Miranda* warnings[1] and then, after the warnings, proceeded to more thoroughly question him, resulting in the challenged statement. We hold that regardless of whether the trial court's denial of the motion to suppress testimony regarding the initial questioning of the defendant was error, any such error was harmless. The trial court properly denied the motion to suppress the defendant's written statement because under the specific facts of the present case there was sufficient separation between the initial questioning and the subsequent interrogation to render the *Miranda* warnings effective and, therefore, we affirm the judgment of the trial court.

The jury reasonably could have found the following facts based upon the evidence. On the evening of December 22, 2011, the victims, Nicholas Ulerio and Brunilda Villa-Rodriguez, were working behind the counter at Ulerio Grocery Store (grocery store) on Homestead Avenue in Hartford. The defendant and Tierais Harris, both wearing masks, entered the grocery store. The defendant was armed with an antique revolver and Harris was armed with a BB gun. The defendant approached the counter and shot the victims multiple times, inflicting serious injuries upon both victims. He then kicked a door repeatedly to gain access to the area behind the counter and proceeded to take approximately $100 from the cash register. The defendant and Harris then left the grocery store. The robbery was recorded on the store's surveillance cameras.

The trial court reasonably could have found the following additional facts based upon the evidence presented at the hearing on the defendant's motion to suppress his statements to the police. Detective Reginald Early of the Hartford Police Department was the lead detective assigned to investigate the robbery at the grocery store. Early had known the defendant for three years, which resulted in a rapport between them. The defendant felt comfortable enough speaking with Early that in the days prior to the robbery he had attempted to contact Early for help because he was homeless. On the basis of a voice mail message that the defendant had left for Early on December 19, 2011, in which the defendant had sought to turn in an antique revolver to the police for cash, Early believed that the defendant may have participated in the robbery.[2]

On January 6, 2012, Early contacted the defendant and arranged to meet him in Keney Park, telling the defendant that the purpose of the meeting was to resolve an outstanding warrant. Early and a second detective, Kevin Salkeld, waited for the defendant in an unmarked police vehicle. The defendant arrived at Keney Park at approximately 3:30 p.m., driving a pickup truck. The defendant then voluntarily sat in the front passenger seat of the police vehicle, with Early seated in the driver's seat and Salkeld seated in the backseat. Early spoke with the defendant and the defendant agreed to accompany the detectives to the police station to turn himself in on the outstanding warrant. At that point the defendant understood that he was under arrest. The defendant then informed the detectives that the pickup truck he had driven to Keney Park was stolen and contained drugs. The detectives arranged for other officers to come and tow the vehicle. While waiting for the officers to arrive, Early asked the defendant if he knew anything about the robbery on Homestead Avenue and if he was willing to speak to the police about the robbery. The defendant responded, " '[y]eah, I know about that . . . .' " Salkeld interpreted the defendant's response to mean that the defendant admitted that he had been involved in the robbery. The detectives did not ask the defendant any additional questions about the robbery while at Keney Park.

The detectives then transported the defendant to the police station, completed the processing of his arrest on the outstanding warrant, and placed him in an interrogation room, where they had him wait while they prepared to question him. The detectives provided *Miranda* warnings to the defendant and at 5:18 p.m., the defendant signed a waiver indicating that he understood his rights and did not wish to invoke them. Subsequently, the detectives questioned the defendant for several hours during which time he provided a detailed statement in which he admitted to participating in the robbery and shooting the victims. Early transcribed the defendant's oral statement into a written statement that the defendant could read and sign. The defendant provided a description of the gun that he used in the robbery, which was the same gun he had previously contacted Early to discuss turning in to the police for cash. He identified the person to whom he sold the gun after the robbery and selected him from a photographic array. The defendant also identified Harris as the other individual involved in the robbery and selected him from a photographic array. Although the defendant initially expressed a desire not to sign the statement, as documented in the statement itself, at approximately 9:30 p.m. the defendant signed it.

The following procedural history is relevant. Subsequent to providing the signed statement, the defendant was arrested and charged by information with multiple

counts relating to the robbery of the grocery store.[3] Prior to the trial, the defendant filed a motion to suppress his statements to the police. The trial court, *Dewey*, *J.*, held a hearing on the motion to suppress on May 27, 2014. The state presented the testimony of Early and Salkeld and submitted into evidence the defendant's *Miranda* waiver, the signed statement, the two photographic arrays, and additional documents the defendant signed during his interrogation. The trial court orally denied the defendant's motion to suppress.

Subsequently, a jury found the defendant guilty of all counts.[4] On April 2, 2015, the court, *Kwak*, *J.*, sentenced the defendant to a total effective sentence of seventy-five years of incarceration, of which fifteen years is a mandatory minimum, followed by ten years of special parole. This appeal followed.

The defendant claims that the trial court improperly denied his motion to suppress his signed statement to the police because the detectives failed to provide him with *Miranda* warnings at Keney Park prior to asking him about the robbery. He claims that the questioning at Keney Park and the subsequent questioning at the police station was a single, continuous interrogation that rendered the *Miranda* warning provided by the detectives at the police station ineffective.

The state first asserts that the defendant's claim is unreviewable because the record is inadequate. The state next claims that the question posed to the defendant at Keney Park about any knowledge he may have had about the grocery store robbery did not amount to interrogation and, therefore, did not require prior *Miranda* warnings.[5] The state further claims that even if the initial question posed by Early at Keney Park constituted an interrogation, required prior *Miranda* warnings, and was inadmissible, the second interrogation at the police station was sufficiently attenuated from the initial interrogation such that the *Miranda* warnings the detectives provided to the defendant prior to the second interrogation rendered his subsequent statement admissible.

As a threshold matter, we first address whether the record is adequate for review. Practice Book § 64-1 (a) provides in relevant part: "The trial court shall state its decision either orally or in writing . . . (4) in ruling on motions to suppress under [§] 41-12 . . . . The court's decision shall encompass its conclusion as to each claim of law raised by the parties and the factual basis therefor. If oral, the decision shall be recorded by a court reporter, and, if there is an appeal, the trial court shall create a memorandum of decision for use in the appeal by ordering a transcript of the portion of the proceedings in which it stated its oral decision. The transcript of the decision shall be signed by the trial judge . . . ." Practice Book § 61-10 (a) provides: "It is the responsibility of the appellant to provide an ade-

quate record for review. The appellant shall determine whether the entire record is complete, correct and otherwise perfected for presentation on appeal."

"When the record does not contain either a [written] memorandum of decision or a transcribed copy of an oral decision signed by the trial court stating the reasons for its decision, [the Appellate Court] frequently has declined to review the claims on appeal because the appellant has failed to provide the court with an adequate record for review. . . . [However] [i]f there is an unsigned transcript on file in connection with an appeal, the claims of error raised by the plaintiff may be reviewed if [the reviewing court] determines that the transcript adequately reveals the basis of the trial court's decision." (Emphasis omitted; internal quotation marks omitted.) *Computer Reporting Service, LLC* v. *Lovejoy & Associates, LLC*, 167 Conn. App. 36, 41 n.2, 145 A.3d 266 (2016).

"The general purpose of [the relevant] rules of practice . . . [requiring the appellant to provide a sufficient record] is to ensure that there is a trial court record that is adequate for an informed appellate review of the various claims presented by the parties." (Internal quotation marks omitted.) *Ammirata* v. *Zoning Board of Appeals*, 264 Conn. 737, 744, 826 A.2d 170 (2003). "[W]hen the facts underlying a claim on appeal are not in dispute and that claim is subject to de novo review, 'the precise legal analysis undertaken by the trial court is not essential to the reviewing court's consideration of the issue on appeal.' *Community Action for Greater Middlesex County, Inc.* v. *American Alliance Ins. Co.*, [254 Conn. 387, 396, 757 A.2d 1074 (2000)]. In other words, a record is adequate for review when the claim on appeal is subject to de novo review and there is no dispute as to the facts underlying that claim." *Ammirata* v. *Zoning Board of Appeals*, supra, 745–46.

In the present case, the trial court orally denied the defendant's motion to suppress, after conducting a hearing on the motion, without making factual findings or elaborating on the legal basis for denial of the motion. Additionally, the defendant did not secure a signed copy of the transcript or seek articulation of the trial court's ruling. While it would have been preferable for the trial court to issue a written memorandum of decision or to state orally its legal basis for denying the defendant's motion to suppress and its factual findings, we hold that the record is adequate for review because none of the material facts are in dispute[6] and the question of whether the trial court properly denied the defendant's motion to suppress is subject to plenary review. See *State* v. *Smith*, 321 Conn. 278, 289, 138 A.3d 223 (2016).

Turning to the substance of the defendant's claim, we next set forth the applicable standard of review and legal principles. "As a general matter, the standard of review for a motion to suppress is well settled. . . .

[When] the legal conclusions of the court are challenged, [our review is plenary, and] we must determine whether they are legally and logically correct and whether they find support in the facts set [forth] in the memorandum of decision . . . ." (Internal quotation marks omitted.) *State* v. *Gonzalez*, 302 Conn. 287, 295–96, 25 A.3d 648 (2011).

A motion to suppress a defendant's confession may implicate the threshold conditions that trigger the need for providing a defendant *Miranda* warnings or the voluntariness of a defendant's waiver of the rights underlying the warnings. We will first address the threshold conditions. "It is well established that the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against [self-incrimination]. *Miranda* v. *Arizona*, [384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966)]." (Internal quotation marks omitted.) *State* v. *Gonzalez*, supra, 302 Conn. 294. "Two threshold conditions must be satisfied in order to invoke the warnings constitutionally required by *Miranda*: (1) the defendant must have been in custody; and (2) the defendant must have been subjected to police interrogation. . . . The defendant bears the burden of proving custodial interrogation. . . . [T]he definition of interrogation [for purposes of *Miranda*] can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response. . . . The test as to whether a particular question is likely to elicit an incriminating response is objective; the subjective intent of the police officer is relevant but not conclusive and the relationship of the questions asked to the crime committed is highly relevant. . . . [*State* v. *Betances*, 265 Conn. 493, 500–501, 828 A.2d 1248 (2003)]. [T]he ultimate determination . . . of whether a defendant already in custody has been subjected to interrogation . . . presents a mixed question of law and fact over which our review is plenary . . . . *State* v. *Edwards*, 299 Conn. 419, 428, 11 A.3d 116 (2011)." (Emphasis in original; internal quotation marks omitted.) *State* v. *Smith*, supra, 321 Conn. 288–89.

"A defendant in custody is subject to interrogation not only in the face of express questioning by police but also when subjected to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. . . . Whether a defendant in custody is subject to interrogation necessarily involves determining first, the factual circumstances of the police conduct in question, and second, whether such conduct is normally attendant to arrest and custody or whether the police should know that such conduct is

reasonably likely to elicit an incriminating response. . . . A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of the police officers that they *should have known* were reasonably likely to elicit an incriminating response. . . . *State* v. *Canady*, 297 Conn. 322, 335–36, 998 A.2d 1135 (2010)." (Emphasis in original; internal quotation marks omitted.) *State* v. *Ramos*, 317 Conn. 19, 29–30, 114 A.3d 1202 (2015).

The defendant claims that admission of his statement in Keney Park was improper because it constituted custodial interrogation and he did not receive *Miranda* warnings. He claims that his second statement, at the police station, should be suppressed as a result of the harm derived by the first, unwarned statement. We conclude that, even if we were to assume that the question posed to the defendant in Keney Park about the Homestead Avenue robbery constituted interrogation and that the testimony regarding the defendant's answer should have been suppressed, the subsequent interrogation at the police station was sufficiently attenuated from the first interrogation at Keney Park to render the intervening *Miranda* warnings effective to ensure that the defendant made a meaningful choice when he participated in the second interrogation. Therefore, we decline to reach the issue of whether the initial question in Keney Park constituted an interrogation.[7]

If a defendant has been provided *Miranda* warnings, he may still challenge the voluntariness of his waiver of those rights described to him in the warnings and his subsequent confession. See *Missouri* v. *Seibert*, 542 U.S. 600, 608 n.1, 124 S. Ct. 2601, 159 L. Ed. 2d 643 (2004). "[T]he use of an involuntary confession in a criminal trial is a violation of due process. . . . The state has the burden of proving the voluntariness of the confession by a fair preponderance of the evidence. . . . [T]he test of voluntariness is whether an examination of all the circumstances discloses that the conduct of law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined . . . ." (Internal quotation marks omitted.) *State* v. *Lawrence*, 282 Conn. 141, 153, 920 A.2d 236 (2007).

When a defendant challenges the admissibility of a warned confession that follows an initial unwarned statement, "absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion. A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordi-

narily should suffice to remove the conditions that precluded admission of the earlier statement. In such circumstances, the finder of fact may reasonably conclude that the suspect made a rational and intelligent choice whether to waive or invoke his rights." *Oregon* v. *Elstad*, 470 U.S. 298, 314, 105 S. Ct. 1285, 84 L. Ed. 2d 222 (1985). "It is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period." Id., 309. "[T]he dictates of *Miranda* and the goals of the [f]ifth [a]mendment proscription against use of compelled testimony are fully satisfied in [such] circumstances . . . by barring the use of the unwarned statement in the [case-in-chief]. No further purpose is served by imputing 'taint' to subsequent statements obtained pursuant to a voluntary and knowing waiver." Id., 318. In contrast, when "[the] circumstances [of the two interrogations] must be seen as challenging the comprehensibility and efficacy of the *Miranda* warnings to the point that a reasonable person in the suspect's shoes would not have understood them to convey a message that [the suspect] retained a choice about continuing to talk," the postwarning statements, as well as the prewarning statements, are inadmissible. *Missouri* v. *Seibert*, supra, 542 U.S. 617. This is true because "when *Miranda* warnings are inserted in the midst of coordinated and continuing interrogation, they are likely to mislead and depriv[e] a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them. . . . [I]t would ordinarily be unrealistic to treat two spates of integrated and proximately conducted questioning as independent interrogations subject to independent evaluation simply because *Miranda* warnings formally punctuate them in the middle." (Citation omitted; internal quotation marks omitted.) Id., 613–14.

"[R]elevant facts that bear on whether *Miranda* warnings delivered midstream could be effective enough to accomplish their object[ive] [include]: the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first."[8] Id., 615.

At one end of the spectrum is *Elstad*, in which the United States Supreme Court held that a brief unwarned interrogation at the defendant's residence did not impermissibly taint a subsequent warned interrogation that occurred several hours later at the police station. *Oregon* v. *Elstad*, supra, 470 U.S. 314, 318. In *Seibert*,

the court noted that "it is fair to read *Elstad* as treating the living room conversation as a [good faith] *Miranda* mistake, not only open to correction by careful warnings before systematic questioning in that particular case, but posing no threat to warn-first practice generally." *Missouri* v. *Seibert*, supra, 542 U.S. 615. At the other end of the spectrum is *Seibert*, where the court found that a police strategy of conducting an extensive unwarned interrogation immediately followed by *Miranda* warnings and then a second interrogation based on the information provided by the defendant in the first interrogation was improper and the post-warning statement was inadmissible because the circumstances rendered the mid-interrogation warning ineffective. Id., 616–17.

In the present case, the circumstances of the two interrogations are more akin to the circumstances found in *Elstad*, in which the Supreme Court held that the statement resulting from the warned interrogation was admissible. *Oregon* v. *Elstad*, supra, 470 U.S. 318. The initial unwarned interrogation at Keney Park was extremely brief and limited in scope in comparison to the warned interrogation at the police station. At most, during the brief initial questioning Early asked the defendant if he knew about the robbery on Homestead Avenue and the defendant stated that he "kn[e]w about that," which statement Salkeld interpreted to mean that he was involved in the robbery. The second interrogation lasted several hours, during which time the defendant was presented with multiple photographic arrays and other documents to annotate, and the defendant provided a detailed confession that, when transcribed by Early, was several pages in length. While there is no evidence that the detectives' initial failure to provide *Miranda* warnings was a mere good faith mistake, there is also no evidence that the detectives used any actual coercion to elicit an involuntary confession from the defendant at Keney Park. The fact that the detectives ceased any questioning once the defendant stated he knew about the robbery does not support a conclusion that the detectives were attempting to engage in the comprehensive question first strategy that was found to be impermissible in *Missouri* v. *Seibert*, supra, 542 U.S. 616. Once the initial questioning ceased, there was also a change in location and a break of several hours between the two interrogations, during which time the defendant was arrested and booked for his unrelated warrant. In addition, the substance of the defendant's signed statement includes evidence that the defendant understood that he had a choice as to whether he would speak with the detectives at the police station. Of particular note is the fact that the defendant told the detectives that he was unsure whether he wanted to sign the statement because he felt that if he did not sign it, he would have a chance to avoid jail, but that if he signed it, he would go to jail for a long time. When he ultimately

decided to sign the statement, the defendant indicated that it was because he "fel[t] really bad about what happened," and he did not reference any belief that he should sign the statement because he had already told the police that he had committed the robbery.[9]

Viewing all of the relevant facts together, the state has met its burden of proving by a preponderance of the evidence that the defendant's waiver of his *Miranda* rights and subsequent written statement was voluntary. We are persuaded that the circumstances surrounding the two interrogations did not create a situation in which the defendant did not believe he had a meaningful choice whether to exercise his right to remain silent when he was provided *Miranda* warnings before the second interrogation. Therefore, we conclude that the trial court properly denied the defendant's motion to suppress the written statement he made at the police station.

The judgment is affirmed.

In this opinion the other justices concurred.

[1] *Miranda* v. *Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966) ("[p]rior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed").

[2] At trial, Early further testified that based on his previous interactions with the defendant, when he watched the surveillance footage of the robbery he believed the physical appearance and mannerisms of the shooter matched those of the defendant.

[3] The defendant was charged in a substitute information with two counts of assault in the first degree in violation of General Statutes § 53a-59 (a) (1) and (5), respectively, and one count each of robbery in the first degree in violation of General Statutes § 53a-134 (a) (2), conspiracy to commit robbery in the first degree in violation of § 53a-134 (a) (2) and General Statutes § 53a-48 (a), and carrying a pistol without a permit in violation of General Statutes § 29-35 (a). Section 29-35 (a) has been amended since the time of the offense in the present case; see Public Acts 2016, No. 16-193, § 9; however, the change was technical in nature and not relevant to this appeal. For purposes of clarity, we refer to the current revision of the statute.

[4] Immediately following the denial of his motion to suppress, the defendant was tried before a jury. The jury was unable to reach a unanimous verdict and a mistrial was declared. In 2015, the defendant was tried a second time before a jury, which resulted in his conviction.

[5] In its brief, the state also asserts that the defendant was not in custody when he was asked if he knew anything about the grocery store robbery. At oral argument before this court, the state abandoned this claim.

[6] The state contends that the record is inadequate because it is unclear which version of Early's question the trial court credited. Upon examination, however, the differences between the versions of the question are not material. Salkeld testified that "Early ask[ed] [the defendant] about a robbery and he s[aid] he was involved," and that he thought Early "might have said something about a robbery on Homestead." Early testified that he told the defendant that he "want[ed] to interview him in regards to a robbery that happened a few days prior." Upon further questioning, Early agreed that he "ask[ed] [the defendant] if he kn[ew] something about that robbery" and later agreed that he "asked him if he knew something about the robbery at Homestead . . . ." While the level of detail included in the question differed between the various versions, it was not disputed that Early asked the defendant if he knew about the robbery and that the defendant knew which robbery Early was referring to in his question. The other circumstances surrounding the question do not materially differ in the two detectives' testimonies and the defendant presented no evidence at the hearing on the motion to suppress.

[7] On appeal, it is not clear whether the defendant is challenging the denial

of the motion to suppress testimony related to his statement at Keney Park or he is only claiming that the statement was improper for purposes of challenging the denial of his motion to suppress his written statement at the police station. Even if we were to assume that it was improper for the trial court to deny the defendant's motion to suppress testimony related to his statement at the park, any error was harmless. See *State* v. *Gonzalez*, supra, 302 Conn. 306–307 (statement taken in violation of *Miranda* admitted at trial subject to harmless error analysis; state bears burden of proving harmlessness beyond reasonable doubt); see also *State* v. *Brunetti*, 279 Conn. 39, 77–78, 901 A.2d 1 (2006) (assuming error to allow testimony that defendant asked for Bible in response to detective notifying him that police had discovered inculpatory evidence, error harmless because of overwhelming evidence against defendant at trial, including subsequent confession), cert. denied, 549 U.S. 1212, 127 S. Ct. 1328, 167 L. Ed. 2d 85 (2007). Beyond the defendant's statement in Keney Park, the jury was also presented with the following evidence: the defendant's written confession; the surveillance video of the robbery; both victims' testimony; Early's testimony; Salkeld's testimony; the testimony of Theo Sullivan, who admitted to driving the defendant and Harris to and from the robbery and scouting the grocery store to determine if any customers were present prior to the robbery; and the testimony of Harris, who admitted his involvement in the robbery and identified the defendant as the shooter. The defendant's statement at Keney Park that he knew about the robbery was so limited in comparison to the detailed statement he provided at the police station and the other evidence presented at trial, that it would not have had a tendency to have impacted the jury's verdict. Additionally, the earlier statement did not contain any information that was not also provided in the defendant's later statement. At most, any improperly admitted evidence related to the statement at Keney Park was cumulative of the properly admitted evidence of the defendant's subsequent statement.

[8] In his concurring opinion in *Seibert*, Justice Breyer advocated for a different, good faith test in which both the first unwarned and the second warned statements would be inadmissible unless the failure to warn in the first instance was a good faith mistake. *Missouri* v. *Seibert*, supra, 542 U.S. 617–18. While we acknowledge that the plurality's factor test is not binding on this court, we find the plurality's approach more persuasive because by focusing on the ability of the defendant to meaningfully exercise his constitutional rights, rather than the intent of the police, the plurality's approach is more closely calibrated to protect the rights underlying *Miranda*.

[9] We acknowledge that the continuity in police personnel is more like the circumstances found in *Seibert* than in *Elstad*, particularly in light of the influence Early's prior relationship with the defendant may have had on his decision to speak with Early. No evidence in the record, however, indicates that Early leveraged his relationship with the defendant to pressure him into confessing during the interrogation at the police station. Further, nothing in the record supports a conclusion that the detectives pressured the defendant to provide a detailed confession by claiming he had no choice since he had already confessed in Keney Park. On the contrary, the defendant indicated in his written statement that he spoke to the detectives about the robbery because he had seen on the news that the two victims "were in critical condition and [he] felt really bad."

————————————————